UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC ESSHAKI, as candidate for United
States Congress and in his individual
capacity,

     Plaintiff,

v

GRETCHEN WHITMER, Governor of
Michigan, JOCELYN BENSON, Secretary of
state of Michigan, and JONATHAN
BRATER, Director of the Michigan Bureau
of Elections, in their official capacities,

     Defendants.

No. 2:20-cv-10831

HON. TERRENCE G. BERG

MAG. ELIZABETH A. STAFFORD

_____/

Gregory J. Rohl (P39185)
Attorney for Plaintiff
41850 W. Eleven Mile Road, Suite 110
Novi, Michigan  48375
248.380.5362

Heather S. Meingast (P55439)
Assistant Attorneys General
Attorneys for Defendants
PO Box 30736
Lansing, Michigan  48909
517.335.7659

_____/

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
TRO/PRELIMINARY INJUNCTION**

## CONCISE STATEMENT OF ISSUES PRESENTED

1.  Whether Plaintiff's motion for temporary restraining order should be denied where Plaintiff has failed to satisfy the requirements for granting such extraordinary relief?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

*Authority*:

Mich. Comp. Laws § 168.544f
Mich. Comp. Laws § 168.133

*Anderson v. Celebrezze*, 460 U.S. 780 (1983)
*Burdick v. Takushi*, 504 U.S. 428 (1992)
*Elrod v. Burns,* 427 U.S. 347, 373-74 (1976)
*Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620 (6th Cir. 2000)
*Libertarian Party of Ky v. Grimes*, 835 F.3d 570, 577 (6th Cir. 2016)
*Maryland v. King*, 133 S. Ct. 1 (2012)
*Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016)

# TABLE OF CONTENTS

Page

Concise Statement of Issues Presented ...............................................................i

Controlling or Most Appropriate Authority .......................................................i

Table of Contents .............................................................................................ii

Introduction ......................................................................................................1

Statement of Facts .............................................................................................1

      A.     Statutory Requirements ..............................................................4

      B.     Procedural History ....................................................................8

Argument ..........................................................................................................9

I.     Plaintiff's motion for a temporary restraining order should be denied where he has not shown a likelihood of success on the merits of his claims or imminent irreparable harm.......................................................9

      A.     Temporary or preliminary injunction factors..................................9

      B.     Plaintiff has not shown a strong likelihood of success on the merits of his First and Fourteenth Amendment claims................... 10

            1.     The burden on Plaintiff is not severe................................... 12

            2.     The State's interest in the signature and deadline requirements is substantial. ............................................... 15

      C.     Plaintiff has not shown he will suffer irreparable harm absent an injunction............................................................................ 18

      D.     The balance of harms weighs in Defendants' favor, and an injunction is contrary to the public interest. ................................ 20

      E.     Request if the Court is inclined to grant injunctive relief. .............. 22

Conclusion and Relief Requested ................................................................... 22

Certificate of Service ...................................................................................23

iii

## INTRODUCTION

Plaintiff asks this Court to enjoin the signature requirement and filing deadline for nominating petitions to qualify as a candidate for the U.S House of Representatives.  He argues the Covid-19 pandemic and the Governor's orders limiting social interactions make it impossible for him to meet these requirements. But Plaintiff fails to demonstrate a strong likelihood of success on the merits of his First and Fourteenth Amendment constitutional claims, and his similar failure to sufficiently demonstrate irreparable harm requires denial of his motion.

## STATEMENT OF FACTS

Plaintiff Eric Esshaki is a candidate for Michigan's Eleventh Congressional District of the United States House of Representatives.  (Comp., Doc. 1, PgID 5, ¶ 17).  Esshaki filed his statement of candidacy with the Federal Election Commission on October 31, 2019.  (*Id*. ¶ 18.)  He also "hired campaign staff and has been diligently campaigning since October 2019." (*Id*., ¶ 19.)  Under Michigan's Election Law, to gain access to the August 4, 2020 primary ballot, Esshaki must file a nominating petition containing at least 1,000 valid signatures from registered voters with Defendant Secretary of State Jocelyn Benson by April 21, 2020.  Mich. Comp. Laws §§ 168.133, 168.544f.

Esshaki alleges that "his campaign team implemented a plan to collect the required number of signatures early on in his campaign."  (Compl., Doc. 1, PgID 6,

¶ 21.)  He further alleges that he, "his campaign team, and several volunteers and supporters have been working diligently, and have already collected nearly seven hundred (700) valid signatures."  (*Id.*, PgID 6, ¶ 22.)

On March 10, 2020, Defendant Governor Gretchen Whitmer declared a state of emergency and invoked emergency powers in Michigan in Executive Order No. 2020-4, in response to the spreading pandemic related to Covid-19 and to two confirmed cases in Michigan.[1]  This order did not restrict the movement or gathering of people in Michigan.  On March 13, 2020, Governor Whitmer issued Executive Order 2020-5, prohibiting assemblages of 250 or more people in a single shared space with limited exceptions, and ordering the closure of all K-12 school buildings.[2]

Esshaki alleges that after President Donald Trump asked people nationwide on March 15, 2020 to begin social distancing in response to the spreading pandemic related to Covid-19, "Esshaki and his campaign postponed *some* of its efforts to collect signatures."  (*Id.*, PgID 6-7, ¶¶ 23-24.) (Emphasis added.)

At the state level, on March 16, 2020, the Governor ordered various places of public accommodation, like restaurants, bars, and exercise facilities, to close

---

[1] EO No. 2020-4, available at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-521576--,00.html.
[2] EO No. 2020-5, available at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-521595--,00.html.

their premises to the public.[3]  And on March 17, 2020, the Governor issued an order rescinding 2020-5, changing the cap on assemblages to 50 persons in a single shared indoor space, and expanding the scope of exceptions from that cap.[4]

Subsequently, on March 23, 2020, again in response to the spreading Covid-19 pandemic in Michigan, Governor Whitmer issued Executive Order No. 2020-21 (referred to as the "Stay-home Order" in Esshaki's complaint), which essentially ordered all persons not performing essential or critical infrastructure job functions to stay in their place of residence, other than to obtain groceries, care for loved ones, engage in outdoor activity consistent with social distancing, and other limited exceptions.[5]  The order also prohibited, with limited exceptions, all public and private gatherings of any number of people that are not part of a single household.[6] That order was to continue through April 13, 2020, however, on April 9, 2020, the Governor issued Executive Order 2020-42, extending the Stay-home Order through April 30, 2020.[7]

---

[3] EO No. 2020-9, available at, https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-521789--,00.html. Replaced by EO 2020-20.

[4] EO No. 2020-11, available at, https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-521890--,00.html.

[5] EO No. 2020-21, available at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-522626--,00.html.

[6] (*Id.*)

[7] EO No. 2020-42, available at https://content.govdelivery.com/attachments/MIEOG/2020/04/09/file_attachments/1423850/EO%202020-42.pdf.

3

As Esshaki alleges, the Stay-home Order does not create an express exception from its restrictions for candidates and campaign staff.  (Doc. 1, Compl., PgID 8, ¶ 29).  On or around March 25, 2020, Esshaki and his campaign staff were informed by Secretary Benson's staff that the April 21, 2020 deadline to obtain and submit the required number of signatures was still in effect.  (*Id*., ¶ 30).  This information was also publicly posted on the Michigan Bureau of Elections' website.  (*Id*., ¶ 31).

Esshaki alleges that the Governor's Stay-home Order has made it impossible for candidates, including himself, "to obtain the required number of elector signatures by April 21, 2020."  (*Id.*, ¶ 36).

## A.    Statutory Requirements

As noted above, Mich. Comp. Laws § 168.133 provides the filing deadline for congressional nominating petitions:

> In order for the name of a person as a candidate for nomination by a political party for the office of representative in congress to appear under a particular party heading on the official primary ballot in the election precincts of a congressional district, a nominating petition shall have been signed by a number of qualified and registered electors residing in the district as determined under section 544f. . . . *Beginning January 1, 2014, if the congressional district comprises more than 1 county, the nominating petition shall be filed with the secretary of state no later than 4 p.m. of the fifteenth Tuesday before the August primary*. . . . Beginning January 1, 2014, if the congressional district is within 1 county, the nominating petition shall be filed with the county clerk of that county no later than 4 p.m. of the fifteenth Tuesday before the August primary. Nominating petitions shall be in the form as prescribed in section 544c.  [Emphasis added.]

4

Under the statute, this year's deadline is April 21, 2020. And section 544f requires that Esshaki, as a congressional candidate for the House, submit a nominating petition containing at least 1,000 valid signatures and not more than 2,000 signatures. Mich. Comp. Laws § 168.544f.

With respect to the race for the Eleventh Congressional District, Democrat Haley Stevens, the current officeholder, and Republican candidates Frank Acosta and Whittney Williams, filed their nominating petitions on March 16, 2020, February 7, 2020, and March 18, 2020, respectively.[8] And overall, 24 congressional candidates have already filed their petitions.[9] Notably, candidates for these congressional races, including Esshaki had he filed his statement of candidacy earlier, could have collected and filed signatures in 2019.

In addition to congressional candidates, there are a number of other offices subject to the April 21 deadline for filing nominating petitions: U.S. Senator, State Representative, all non-incumbents seeking judicial offices, all countywide offices and county commissioners, all township offices, and the Wayne County Community College Board of Trustees. (Ex 1, Chart). But the signature requirements vary widely for these offices, given the size of the district and

---

[8] See 2020 Michigan Candidate Listing for August Primary, available at https://miboecfr.nictusa.com/election/candlist/2020PRI_CANDLIST.html.
[9] (*Id.*)

5

whether the candidate is affiliated with a party or running as an unaffiliated candidate.  (*Id.*)

The April 21 deadline for nominating petitions is just one of many deadlines that carefully control the election processes leading up to an election, and relevant here, leading up to the August 4, 2020 primary election.[10]  The deadline for nominating petitions helps ensure that the filing official responsible for canvassing such petitions, here Secretary Benson, has time to perform the canvass, and that the slate of candidates can be properly certified, here by the Board of State Canvassers, and that ballots can be printed, proofed, and ready for delivery by the local clerks to absent ballot voters, including military and overseas voters.[11]  The relevant and important deadlines for the August primary include:

| Date and Time[12] | Action | Statute |
|---|---|---|
| By 4:00 pm on April 21 | Candidates for partisan office must file nominating petitions and Affidavit of Identity for the August Primary | MCL 168.133 |
| By 4:00 pm on April 24 | Deadline for candidates to withdraw from the August Primary | MCL 168.134 |
| April 28 | Deadline to submit challenges against nominating petitions filed by partisan candidates to filing official | MCL 168.552 |
| June 2 | Board of State Canvassers must complete canvass of nominating petitions filed by candidates for the | MCL 168.552 |

---

[10] See 2020 Michigan Election Dates, pp 6-9, available at https://www.michigan.gov/documents/sos/2020_Elec-Dates-Booklet_ED-12_10-09-19_668275_7.pdf.

[11] (*Id.*)

[12] All times are 5:00 pm unless otherwise specifically noted.

| | August Primary; Secretary of State certifies candidates eligible to appear on August primary ballot to county election commissions. | |
| June 5 | Approximate date county clerks will begin printing ballots for the August Primary | |
| June 20 | Delivery of military and overseas AV ballots must begin | MCL 168.759a |
| June 20 | Deadline for county clerks to deliver AV ballots for the August Primary to local clerks | MCL 168.714 |
| June 25 | Deadline for AV ballots to be made available to voters | Mich. Const., Art. 2 § 4 |
| By 4:00 pm on July 24 | Write-in candidates file Declaration of Intent form | MCL 168.737a |
| August 4 | State Primary | |

Currently, 67 candidates for various offices have filed petition signatures with the Bureau of Elections with more petition filings anticipated by the April 21, 2020 filing deadline.[13]  After the filing deadline, interested parties have the opportunity to submit challenges against the nominating petitions to the Bureau within seven days.  Mich. Comp. Laws § 168.552.  The petitions and any challenges must be canvassed by staff to determine the number of facially valid signatures by reviewing each petition sheet for facial defects such as heading errors, circulator errors, or incomplete signor information like omitted date or

---

[13] *See* 2020 Michigan Candidate Listing for August Primary, available at https://miboecfr.nictusa.com/election/candlist/2020PRI_CANDLIST.html

address.  The Bureau then completes a staff report containing recommendations to the Board of State Canvassers, which must be made available at least 2 full business days prior to the Board's meeting where it will determine the sufficiency of the nominating petitions.  Mich. Comp. Laws § 168.552(10).

The Board of State Canvassers must meet and complete the canvass of all nominating petitions by June 2, 2020.  Mich. Comp. Laws § 168.552(11).  That same day, the Secretary of State must certify the names of candidates eligible to appear on the August primary ballot to the local county clerks who will commence printing.  (*Id*.)

## B.    Procedural History

Plaintiff Esshaki filed his complaint for declaratory and injunctive relief, along with a motion for a temporary restraining order, late in the day on March 31, 2020.  The undersigned counsel received a forwarded email from Plaintiff's counsel containing the electronic filings at 11:43 p.m. on March 31, 2020.  The undersigned counsel distributed electronic copies of the complaint, motion, and brief to the named parties during the morning of April 1, 2020.  The same day, this Court and the parties, represented by counsel, conducted a telephone conference to discuss Plaintiff's motion.  Defendants agreed to submit a response to the motion by Friday, April 10, 2020.

# ARGUMENT

**I.    Plaintiff's motion for a temporary restraining order should be denied where he has not shown a likelihood of success on the merits of his claims or imminent irreparable harm.**

### A.    Temporary or preliminary injunction factors.

Like a preliminary injunction, a temporary restraining order is an extraordinary remedy "designed to preserve the relative positions of the parties until a trial on the merits can be held." *Cf. Tennessee Scrap Recyclers Ass'n v. Bredesen,* 556 F.3d 442, 447 (6th Cir. 2009). A court considers "four factors when determining whether to grant a temporary restraining order: '(1) whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of [a TRO] would cause substantial harm to others; and (4) whether the public interest would be served by issuance of [a TRO].' " *Kendall Holdings, Ltd. v. Eden Cryogenics LLC,* 630 F. Supp.2d 853, 860 (S.D. Ohio 2008) (quoting *Leary v. Daeschner,* 228 F.3d 729, 736 (6th Cir. 2000)). No one factor is dispositive; rather the court must balance all four factors. *In re De Lorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir. 1985). The burden of persuasion is on the party seeking the injunctive relief. *Stenberg v. Cheker Oil Co.,* 573 F.2d 921, 925 (6th Cir. 1978).

**B.      Plaintiff has not shown a strong likelihood of success on the merits of his First and Fourteenth Amendment claims.**

The Sixth Circuit has long held that in determining whether to grant an injunction, the movant must show a "strong likelihood of success on the merits." *See e.g. Ohio Republican Party v. Brunner,* 543 F.3d 357, 361 (6th Cir. 2008); *NEOCH v. Blackwell,* 467 F.3d 999, 1009 (6th Cir. 2006); *Summit County Democratic Cent. & Exec Comm. v. Blackwell,* 388 F.3d 547, 550 (6th Cir. 2004).

Plaintiff argues that the enforcement of the statutory deadline and the statutory signature requirement "during this national time of crisis and in light of Governor Whitmer's Stay-home Order is unconstitutional."  (Doc. 2, TRO Brf, PgID 53).  This is because "Defendants have stripped candidates like Esshaki of the ability to meet these requirements because the Stay-home Order prohibits Esshaki from leaving his home for non-essential purposes like signature gathering."  (*Id.*)  He further notes that the Stay-home Order "further requires Esshaki to maintain a distance of six feet from voters in his district, which effectively eliminates any possibility of electors to provide their signatures without themselves having violated the Order."  (*Id.*)  And that taken together, the statutes and "the Stay-home Order impose burdens so severe that they 'function as an absolute bar' to Esshaki getting his name on the August 2020 primary ballot."  (*Id.*, quoting *Graveline, et al v. Benson, et al.*, 336 F. Supp. 3d 801, 809 (E.D. Mich. 2018).

10

While Plaintiff has no fundamental right to run for an elective office, *see, e.g.*, *Bullock v. Carter,* 405 U.S. 134, 142-43 (1972) (no "fundamental right to run for elective office"), and "[a] voter has no right to vote for a specific candidate," *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998) (citations omitted), candidate qualification statutes nevertheless implicate " 'the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.' " *Anderson v. Celebrezze,* 460 U.S. 780, 786-87 (1983) (quoting *Williams v. Rhodes,* 393 U.S. 23, 30-31 (1968)).  These rights are protected by the First and Fourteenth Amendments.  *Id.*

To assess candidate eligibility requirements, courts apply the *Anderson-Burdick* analysis from *Anderson* and *Burdick v. Takushi,* 504 U.S. 428 (1992). *Citizens for Legislative Choice*, 144 F.3d at 920.  If a state imposes "severe restrictions" on a plaintiff's constitutional right, its regulations survive only if "narrowly drawn to advance a state interest of compelling importance."  *Burdick*, 504 U.S. at 434.  But "minimally burdensome and nondiscriminatory" regulations are subject to a "less-searching examination closer to rational basis" and "'the State's important regulatory interests are generally sufficient to justify the restrictions.'"  *Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016) (citing *Green Party of Tenn. v. Hargett (Hargett I)*, 767 F.3d 533,

11

546 (6th Cir. 2014), and quoting *Burdick*, 504 U.S. at 434).  Regulations falling

somewhere in between—"i.e., regulations that impose a more-than-minimal but

less-than-severe burden—require a 'flexible' analysis, 'weighing the burden on the

plaintiffs against the state's asserted interest and chosen means of pursuing it.' "

*Ohio Democratic Party*, 834 F.3d at 627 (quoting *Hargett I*, 767 F.3d at 546).

### 1.    The burden on Plaintiff is not severe.

Plaintiff argues that the signature and deadline statutes combined with the

Governor's Stay-home Order imposes a severe burden on his ability to become a

candidate by limiting his ability to collect the required number of signatures, at

least 1,000, by the required deadline, April 21.  There is a burden imposed by these

regulations on Plaintiff, but it is not severe under the circumstances.  Plaintiff

decided relatively late to become a candidate, only filing his statement of

candidacy in October 2019.  He asserts that he hired campaign staff, yet by the

filing of his complaint on March 31, 2020, he had only collected 700 signatures

after 5 months of campaigning.  His assertion that he and his staff have been

diligent in collecting signatures is not substantiated or persuasive.  See, e.g., *Storer*

*v. Brown*, 415 U.S. 724, 742 (1974) (in assessing ballot access claims by

independent candidates, the question is "could a reasonably diligent independent

candidate be expected to satisfy the signature requirements").

Moreover, Governor Whitmer's declaration of emergency on March 10, 2020, should have acted as a wake-up call to Plaintiff and his staff to double-down on signature collection efforts. The Stay-home Order was not issued until March 23, meaning Plaintiff had 13 additional days from the declaration of emergency to collect signatures before social interaction was severely curtailed. That should have been sufficient time to collect the few hundred more signatures Plaintiff needed in order to file.

In addition, even after issuance of the Stay-home Order, Defendants are aware that many candidates have continued to collect signatures by switching to the use of regular mail. Candidates can obtain voter lists for the district within which they are running through their local clerk, or through the Bureau of Elections, send voters a petition, ask the voters to sign the petition as a signer and a circulator, and send the petition back to the candidate, usually in a self-addressed, stamped envelope. This process does involve a cost, but candidates are not entitled to free access to the ballot. *See, e.g.*, *Libertarian Party of Ky v. Grimes*, 835 F.3d 570, 577 (6th Cir. 2016) ("the incidental costs of gathering signatures on petitions do not come close to exclusion from the ballot, and thus do not impose a severe burden on ballot access"). *See also Green Party of Arkansas v. Martin*, 649 F.3d 675, 683 (8th Cir. 2011) ("Although the Green Party may incur some costs because of its choice to hire individuals to collect signatures, the ballot access scheme does

13

not impose severe burdens on the Green Party and Arkansas need not collapse every barrier to ballot access.")

And in the end, even if Plaintiff is unsuccessful in filing sufficient signatures by the deadline, he has an alternative avenue to the ballot.  He can choose to run as a write-in candidate for the Republican Primary in August, which requires no signatures, can be accomplished by mail, and is not due until July 24, 2020.  Mich. Comp. Laws § 168.737a.  Or he can simply run as a write-in candidate for the November 2020 general election. (*Id.*).  Write-in candidacies have been successful in Michigan, for example, Mike Duggan became Mayor of the City of Detroit through a successful write-in primary campaign in 2013.[14]  And Winnie Brinks won the Democratic Primary for State Representative in 2012.[15]

Under these circumstances, the burden on continuing to require Plaintiff to meet these statutory requirements is not severe.  Rather, it is somewhere between the minimal and severe burdens discussed in *Anderson* and *Burdick*, thus necessitating a flexible analysis.  *Ohio Democratic Party*, 834 F.3d at 627.

---

[14] *See,* https://www.michiganradio.org/post/duggan-makes-history-winning-write-campaign-napoleon-rallies-supporters.
[15] *See*, https://calvinchimes.org/2012/11/05/2369/.

### 2. The State's interest in the signature and deadline requirements is substantial.

The "right to vote in any manner . . . [is not] absolute," *Burdick*, 504 U.S. at 433 (citation omitted); the Constitution recognizes the states' clear prerogative to prescribe time, place, and manner restrictions for holding elections.  U.S. Const. art. I, § 4, cl. 1.  Indeed, there "must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick*, 504 U.S. at 433 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).  Federal law thus generally defers to the states' authority to regulate the right to vote.  *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 203-04 (2008) (Stevens, J., op.) (recognizing that neutral, nondiscriminatory regulation will not be lightly struck down).  Michigan's Constitution expressly provides that the Legislature "shall enact laws . . . to preserve the purity of elections," and to "guard against abuses of the elective franchise[.]"  Mich. Const. 1963 art. 2, § 4(2).

With respect to the signature requirement, the Supreme Court has consistently recognized that states, like Michigan, have an important interest in requiring some preliminary showing of a significant modicum of support before printing the name of a candidate on the ballot; this protects the integrity of the electoral process by regulating the number of candidates on the ballot and avoiding voter confusion. *See Jenness v. Forton*, 403 U.S. 431, 441 (1971); *American Party*

15

*of Texas v. White*, 415 U.S. 767, 783 (1974); *Munro v. Socialist Workers Party,* 479 U.S. 189, 194 (1986); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 367 (1997).  The Sixth Circuit has likewise recognized that states have "an important interest in ensuring that candidates demonstrate a 'significant modicum of support,' before gaining access to the ballot, primarily in order to avoid voter confusion, ballot overcrowding, and frivolous candidacies." *Libertarian Party of Kentucky*, 835 F.3d at 577.  Section 544f advances that important interest in Michigan by requiring Plaintiff to demonstrate he has a significant modicum of public support in the district for his candidacy.

Turning to the filing deadline, as noted above, states have the power to prescribe time, place, and manner restrictions for holding elections. *Burdick*, 504 U.S. at 433.  Here, the filing deadline is not arbitrary or designed to short-change candidates like Plaintiff; it is part of a carefully constructed set of election deadlines extending backward from the date of the election, including the 40th-day deadline for having ballots available to be distributed to absent voters.

And as noted above, Secretary Benson is the filing official for all congressional candidates (with the exception of the Thirteenth District).  Thus, the Secretary, through the Bureau of Elections, must canvass all the nominating petitions filed by congressional candidates for the House and the Senate.  This is in addition to other candidate filings the Bureau must canvass.  Accordingly, the

16

Bureau has thousands and thousands of signatures to canvass between April 21 and June 2, 2020, when the slate of candidates must be certified for the August ballot. Infringing on any of the statutory deadlines threatens the integrity of the process.

The April 21 deadline reflects a necessary cog in Michigan's election machinery that keeps the process running in an orderly manner. The Sixth Circuit has recognized that "easing administrative burdens" on elections officials is "undoubtedly '[an] important regulatory interest[ ].' " *Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016) (citation omitted). The filing deadline advances that important regulatory interest by ensuring that the Secretary of State and her staff have sufficient time to canvass petitions, provide a challenge period, and meet the ballot certification deadline, which triggers final preparations for ballot printing by the counties.

The burden on Plaintiff here is not the result of any statute, but the state of emergency created by the Covid-19 pandemic and the necessary orders limiting social interaction. As the Governor explains in those orders, her actions are necessary to preserve and protect the lives of Michigan's citizens.[16] While providing people like Plaintiff with the *opportunity*, as opposed to a right, to participate in the political process is important, it is not on par with protecting

---

[16] EO No. 2020-42, available at
https://content.govdelivery.com/attachments/MIEOG/2020/04/09/file_attachments/1423850/EO%202020-42.pdf.

lives.  With so much disruption already occurring at all levels of government, the Secretary and the Governor are trying to maintain processes where they can to limit further disruption and confusion.  This includes limiting unnecessary disruptions to the electoral process.[17]  On balance, and under these circumstances, requiring candidates, like Plaintiff, to continue to meet their signature and filing deadlines is not an unconstitutional burden.

**C.    Plaintiff has not shown he will suffer irreparable harm absent an injunction.**

In considering issuing an injunction, courts must consider whether the plaintiff will suffer irreparable injury without the injunction.  *Certified Restoration Dry Cleaning Network v. Tenke Corp.,* 511 F.3d 535, 550 (6th Cir. 2007).  "To demonstrate irreparable harm, the plaintiffs must show that . . . they will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.,* 443 F.3d 540, 552 (6th Cir. 2006).  Harm is irreparable if it cannot be fully compensated by monetary damages.  *Overstreet v. Lexington–*

---

[17] Plaintiff notes that the Governor issued Executive Orders extending the canvass of the March 10, 2020, presidential primary election, *see* https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-522936--,00.html, and accommodating the conducting of the May 5, 2020, election to be principally by absent voter ballot, *see* https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-523400--,00.html.  These orders were necessary to address the problems and dangers of in-person canvassing and in-person voting without unduly disrupting the electoral process. The relief Plaintiff seeks here, meanwhile, is not similarly necessary and unduly disruptive, for the reasons set forth in this brief.

*Fayette Urban County Gov't,* 305 F.3d 566, 578 (6th Cir. 2002).  Irreparable harm may also exist where a plaintiff can demonstrate a substantial likelihood of success on the merits of the plaintiff's claim that his or her constitutional right has or will imminently be violated.  *Elrod v. Burns,* 427 U.S. 347, 373-74 (1976).

In his declaration, Plaintiff asserts that the Stay-home Order has impeded or prohibited him from continuing to gather signatures in person.  (Doc. 2, TRO Brf, Ex A, Esshaki Dec, PgID 61, 66).  He complains that without relief, he will have lost a substantial amount of time and money or will be required to spend "a substantial amount of time and money" to attempt to collect signatures by mail "when there is no evidence that such a strategy would yield even one additional signature."  (*Id.*)  He asserts that his "supporters and [he] will be further injured and will suffer irreparable harm to our voting, speech, and associational rights because [his] name will not appear on the ballot and [they] will not be able to vote for the candidate of [their] choice."  (*Id.*, PgID 66-67).

It is worth noting again that Plaintiff commenced his campaign late, and despite circulating his petitions for 5 months, has only 700 signatures to show for his and his staff's effort.  A late start and questionable diligence certainly places much of his alleged injury on Plaintiff's shoulders.  Regardless, losing time and money is something that every potential candidate faces, whether it's because he or she failed to make the ballot or lost an election.  As far as spending money on a

19

mail campaign, as noted above, Defendants are aware that other candidates are doing so, and Plaintiff could certainly solicit contributions from his supporters to support such a campaign.  Plaintiff only needs a few hundred more signatures, not the thousands that other candidates must obtain.  (Ex 1, Chart).  Moreover, it does not appear from his declaration that Plaintiff has even attempted to secure signatures by mail.  He can hardly complain about that option without having attempted to use it.  These facts do not support a finding of irreparable harm.

As for injury to his and his supporters' associational rights, irreparable harm only exists if Plaintiff has demonstrated a likelihood of success on the merits of his constitutional claims, which, as argued above, he has not.  And as the Sixth Circuit has held, "a finding that there is simply no likelihood of success on the merits is usually fatal" to a request for injunctive relief.  *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

### D. The balance of harms weighs in Defendants' favor, and an injunction is contrary to the public interest.

The remaining factors, "harm to the opposing party and weighing the public interest . . . merge when the Government is the opposing party."  *Nken v. Holder,* 556 U.S. 418, 435 (2009).  While there will be no irreparable harm to the Plaintiff without an injunction, the issuance of an injunction will irreparably harm the State and its citizens.  The Supreme Court has recognized that "anytime a State is enjoined by a court from effectuating statutes enacted by representatives of its

20

people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, *3 (2012) (C.J. Roberts in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977). The election laws challenged here were duly enacted by the Michigan Legislature, and, as discussed above, they serve an important governmental interest. The people of Michigan have a strong interest in having the State's election laws effectuated. *See Maryland*, 567 U.S. at *3.

In addition to the State's concern regarding disruption to the electoral process discussed above, the State has an interest in protecting against the disparate or inequitable treatment of candidates. As noted above, many congressional candidates have already timely filed their nominating petitions, and several did so after the Governor declared a state of emergency and/or after issuance of the Stay-home Order.[18] And as to the Eleventh District, the Democratic incumbent and two Republican candidates have already filed.[19] All of these candidates have, at least on the face of their filings, met their burden to show the requisite modicum of support for achieving ballot access. Plaintiff's failure to do so could just as well be the result of a lack of popular support than social-distancing impediments. In that case, granting Plaintiff the relief he seeks acts as a windfall and not equity. This Court should deny Plaintiffs' request for temporary injunctive relief.

---

[18] See Candidate Listing for August 2020 primary, at https://miboecfr.nictusa.com/election/candlist/2020PRI_CANDLIST.html.
[19] (*Id.*)

### E.    Request if the Court is inclined to grant injunctive relief.

Although not stated in his motion or brief in support of injunctive relief, Plaintiff's complaint asks the Court to enter an order "requiring Defendants to either extend the deadline, decrease the signature requirements, or place Esshaki's name on the ballot upon his filing of a nominating petition with fewer than the required number of signatures."  (Doc. 1, Compl., PgID 13).  If this Court is inclined to grant relief that would include extending or modifying the filing deadline, Governor Whitmer, Secretary Benson and Director Brater respectfully request an opportunity to comment on what a workable deadline would be under the circumstances.  Further, if the Court is inclined to grant some other form of relief not already advanced by the Plaintiff in his pleadings, Defendants would likewise request an opportunity to provide this Court with comments.

## CONCLUSION AND RELIEF REQUESTED

For the reasons stated above, Defendants Secretary of State Jocelyn Benson, Governor Gretchen Whitmer and Director of Bureau of Elections Jonathan Brater respectfully request that this Honorable Court deny Plaintiff's request for a temporary restraining order.

Respectfully submitted,

*s/Heather S. Meingast*
Heather S. Meingast (P55439)
Assistant Attorney General
Attorney for Defendant
P.O. Box 30736
Lansing, Michigan  48909
517.335.7659
Email:  meingasth@michigan.gov
P55439

Dated:  April 10, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2020, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

*s/Heather S. Meingast*
Heather S. Meingast (P55439)
Assistant Attorney General
P.O. Box 30736
Lansing, Michigan  48909
517.335.7659
Email:  meingasth@michigan.gov
P55439