UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC ESSHAKI, as candidate for
United States Congress and in his
individual capacity,

       Plaintiff,

v.

GRETCHEN WHITMER, Governor
of Michigan, JOCELYN BENSON,
Secretary of State of Michigan, and
JONATHAN BRATER, Director of
the Michigan Bureau of Elections, in
their official capacities,

       Defendants.

_____/

No. 2:20-cv-10831

Hon. Terrence G. Berg

Mag. Judge Elizabeth A. Stafford

Michael J. Steinberg (P43085)
Katie Chan*
Diane Kee*
Brian Remlinger*
Civil Rights Litigation Initiative
University of Michigan Law School
701 South State Street, Suite 2020
Ann Arbor, MI  48109
(734) 615-2407
mjsteinb@umich.edu

* Student attorneys practicing
  pursuant to L.R. 83.21

Daniel S. Korobkin (P72842)
American Civil Liberties Union Fund
  of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6824
dkorobkin@aclumich.org

**AMICUS CURIAE BRIEF OF THE
AMERICAN CIVIL LIBERTIES UNION OF MICHIGAN**

## TABLE OF CONTENTS

INDEX OF AUTHORITIES ............................................................................. iii

AMICUS CURIAE STATEMENT OF INTEREST ................................................. 1

INTRODUCTION ....................................................................................... 1

FACTS ................................................................................................... 4

LEGAL STANDARD ................................................................................... 5

ARGUMENT............................................................................................. 5

THIS COURT SHOULD GRANT THE MOTION FOR
INJUNCTIVE RELIEF BECAUSE STRICT ENFORCEMENT
OF THE SIGNATURE REQUIREMENT FOR BALLOT
ACCESS DURING THE COVID-19 EMERGENCY IS
UNCONSTITUTIONAL AND THE BALANCE OF EQUITIES
FAVORS PLAINTIFF. ................................................................................. 5

A.    Plaintiff Is Likely to Succeed on the Merits Because Strict
      Enforcement of the Signature Requirement Rules Burdens
      Fundamental Rights and There Are Other More Narrowly-
      Tailored Means to Satisfy State Interests. ........................................... 6

      1.    Enforcing the signature rules during the pandemic
            severely burdens constitutional rights........................................ 7

      2.    The state's interests are legitimate, but not
            compelling, when viewed in the light of present
            circumstances. ....................................................................... 8

      3.    Strict adherence to the signature rules is not the least
            drastic means to advance state interests under
            present circumstances. ........................................................... 11

      4.    Even if strict adherence to the signature rules were
            not a severe burden on plaintiff's rights, it would
            still not survive intermediate scrutiny...................................... 17

B.    Plaintiff and Others Will Suffer Irreparable Harm Absent an Injunction..................................................................... 18

C.    The Public Interest Would Suffer If an Injunction Is Not Entered Because Voters Would be Deprived of Their First Amendment Rights, and the Health and Safety of the Public Could Be Needlessly Put at Risk. .......................... 19

CONCLUSION AND RECOMMENDED RELIEF ............................................. 20

# INDEX OF AUTHORITIES

## Cases

*ACLU Fund of Mich. v. Livingston Cty.*, 796 F.3d 636 (6th Cir. 2015) ................. 19

*ACLU of Ky. v. McCreary Cty.*, 354 F.3d 438 (6th Cir. 2003) ............................... 18

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ................................................ 6, 8, 17

*Burdick v. Takushi*, 504 U.S. 428 (1992) ......................................................... 6, 7, 8

*California Democratic Party v. Jones*, 530 U.S. 567 (2000) ............................... 7, 9

*City of Dearborn v. Comcast of Mich.*, 558 F. Supp. 2d 750
    (E.D. Mich. 2008) ................................................................................................ 5

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998) ........................... 18

*Crawford v. Marion Cty. Election Bd.*, 533 U.S. 181 (2008) ................................. 8

*Faulkner for Virginia v. Va. Dep't of Elections*,
    No. CL 20-1456 (Va. Cir. Ct. Mar. 25, 2020) ........................................... 12, 13

*George v. Hargett*, 879 F.3d 711 (6th Cir. 2018) ................................................... 6

*Graveline v. Benson*, __ F. Supp. 3d __,
    No. 18-12354, 2019 WL 7049801 (E.D. Mich. Dec. 22, 2019) ......................... 8

*Green Party of Tenn. v. Hargett*, 767 F.3d 533 (6th Cir. 2014) ....................... 7, 17

*Ill. State Bd. of Elections v. Socialist Workers Party*,
    440 U.S. 173 (1979) ........................................................................................ 11

*In re DeLorean Motor Co.*, 755 F.2d 1223 (6th Cir. 1985) ..................................... 5

*Jenness v. Fortson*, 403 U.S. 431 (1971) ............................................................... 9

*Libertarian Party of Ky. v. Grimes*, 835 F.3d 570 (6th Cir. 2016) .......................... 8

*Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579 (6th Cir. 2006) ............. 6, 19

*Libertarian Party of Ohio v. Husted*, 751 F.3d 403 (6th Cir. 2014) ...................... 18

*Lubin v. Panish*, 415 U.S. 709 (1974) ................................................................... 17

*Malam v. Adducci*, __ F. Supp. 3d __,
    No. 20-10829, 2020 WL 1672662 (E.D. Mich. Apr. 6, 2020) .......................... 19

*Mays v. LaRose*, 951 F.3d 775 (6th Cir. 2020) .......................................................... 8

*Nader v. Blackwell*, 545 F.3d 459 (6th Cir. 2008) ........................................ 6, 16, 18

*Ohio Council 8 Am. Fed'n of State, Cty. & Mun. Emps. v. Husted*,
    814 F.3d 329 (6th Cir. 2016) ................................................................... 6, 7

*Ohio Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016) .......................... 17

*Tocco v. Tocco*, 409 F. Supp. 2d 816 (E.D. Mich. 2005) ........................................ 5

*Washington v. Reno*, 35 F.3d 1093 (6th Cir. 1994) .................................................. 5

*Williams v. Rhodes*, 393 U.S. 23 (1968) .................................................................. 7

**Statutes**

13 U.S.C. § 221 ........................................................................................................ 16

M.C.L. § 168.163 ................................................................................................. 4, 10

M.C.L. § 168.193 ................................................................................................. 4, 10

M.C.L. § 168.254 ...................................................................................................... 4

M.C.L. § 168.303 ................................................................................................. 4, 10

M.C.L. § 168.349 ...................................................................................................... 4

M.C.L. § 168.544c ................................................................................................... 14

H. 681, 2019-2020 Gen. Assemb., Adjourned Sess. (Vt. 2020) ........................ 3, 13

**Other Authorities**

*Amid COVID-19 Pandemic, Governor Cuomo Signs Executive Order
    Temporarily Modifying Election Procedures to Reduce Spread of
    Coronavirus* (Mar. 14, 2020) .......................................................... 2, 12

Corasaniti, Nick, & Stephanie Saul, *16 States Have Postponed Their Primaries Because of Coronavirus. Here's A List.*, N.Y. TIMES (Apr. 13, 2020) ................................................................. 13

Gibbons, Lauren, *Without Deadline Extension, Coronavirus Could Keep Some Michigan Political Candidates Off the Ballot*, MLIVE (Mar. 27, 2020) ................................................................. 10

*Gov. Herbert Suspends Sections of Utah Statute Regarding Signature Gathering* (Mar. 26, 2020) ............................................................ 2, 12

*Governor Murphy Announces Changes to Upcoming New Jersey Elections in Response to COVID-19* (Mar. 19, 2020) ................................... 2, 12

*Governor Northam Announces Plans to Postpone Upcoming Virginia Elections in Response to COVID-19* (Apr. 8. 2020) ...................................... 3, 13

*Governor Whitmer Signs Executive Order Expanding Absentee Voting in May 5 Elections* (Apr. 8, 2020) ...................................... 14

*Governor Whitmer Signs Executive Order Removing Barriers to Remote Transactions and Estate Planning* (Apr. 8, 2020) .............................. 15

Lowenstein, Daniel Hays, & Robert M. Stern, *The First Amendment and Paid Initiative Petition Circulators: A Dissenting View and A Proposal*, 17 HASTINGS CONST. L.Q. 175, 206 (1989) ...................................... 16

*Secretary of State Laurel M. Lee Announces Business Annual Report Filing Deadline Extension and Changes to Candidate Petition and Qualifying Processes* (Apr. 6, 2020) ............................................................ 2, 12

State Bar of Mich., *2020 SBM Election Information* (Mar. 30, 2020) ................... 12

Va. Dep't of Elections, HOW TO RUN FOR UNITED STATES SENATE (Apr. 2020) ...................................................................... 12

## AMICUS CURIAE STATEMENT OF INTEREST

The American Civil Liberties Union of Michigan ("ACLU") is the Michigan affiliate of a nationwide, nonpartisan organization with over a million members dedicated to protecting the rights guaranteed by the United States Constitution. As set forth in more detail in its motion to file an amicus brief, the ACLU has long been committed to protecting the right to vote, ballot access, the freedom to petition, and other rights vital to a healthy and robust democracy. The ACLU believes that its amicus curiae brief will be of assistance to the Court.

## INTRODUCTION

In normal times, Michigan's requirement that candidates collect a specified number of signatures to secure a spot on the ballot is likely constitutional. Additionally, given the grave public health threat posed by COVID-19, amicus makes no claim that Governor Whitmer's stay-home orders are unconstitutional. What is unconstitutional, however, is the state's strict adherence to the statutory signature requirement in the midst of a deadly pandemic when it is not only unsafe, but also a crime, to collect signatures in person.

Strict adherence to the signature requirement in these times severely burdens the right of candidates to associate for the advancement of political beliefs, and the right of voters to cast their votes effectively. In fact, it is preventing numerous candidates from running for office who would have easily made it onto the ballot,

but for the pandemic. These candidates include individuals running for the United States Congress, state judicial office, and city council.

Given this severe burden on fundamental rights, this Court should review the state regulations under strict scrutiny. But whether the court employs strict scrutiny or intermediate scrutiny, the signature requirement, as applied, is not sufficiently tailored to meet the interests asserted by the state.

Other states in this situation have instituted common-sense measures to compensate for the fact that a contagious disease is killing Americans at a rate that is unprecedented in modern times. For example, Florida,[1] New Jersey,[2] and Utah[3] have allowed nomination petitions to be signed and verified electronically. New York has reduced the number of signatures required to qualify for the ballot.[4]

---

[1] *Secretary of State Laurel M. Lee Announces Business Annual Report Filing Deadline Extension and Changes to Candidate Petition and Qualifying Processes* (Apr. 6, 2020), https://dos.myflorida.com/communications/press-releases/2020/secretary-of-state-laurel-m-lee-announces-business-annual-report-filing-deadline-extension-and-changes-to-candidate-petition-and-qualifying-processes/.

[2] *Governor Murphy Announces Changes to Upcoming New Jersey Elections in Response to COVID-19* (Mar. 19, 2020), https://www.nj.gov/governor/news/news/562020/20200319a.shtml.

[3] *Gov. Herbert Suspends Sections of Utah Statute Regarding Signature Gathering* (Mar. 26, 2020), https://governor.utah.gov/2020/03/26/gov-herbert-suspends-sections-of-utah-statute-regarding-signature-gathering/.

[4] *Amid COVID-19 Pandemic, Governor Cuomo Signs Executive Order Temporarily Modifying Election Procedures to Reduce Spread of Coronavirus* (Mar. 14, 2020),

Virginia has pushed back the dates of primaries[5] and Vermont has entirely suspended its signature requirement for elections in 2020.[6]

Despite the availability of all of these more narrowly tailored solutions, Michigan has not yet acted to relieve the severe burden imposed by the signature requirement during a pandemic. This failure to act is not only unconstitutional, but it risks placing the health, safety and welfare of Michiganders in jeopardy. As plaintiff's papers illustrate, many candidates who did not collect all their signatures before the pandemic hit will not make the ballot. But there are some who, feeling that the state has left them with no viable choice, have already resorted to in-person signature collection during this state of emergency as the April 21 deadline approaches.[7] This predictable result could place petition circulators, petition signers, their respective families, and the general public at risk and is contrary to the public interest.

---

https://www.governor.ny.gov/news/amid-covid-19-pandemic-governor-cuomo-signs-executive-order-temporarily-modifying-election.

[5] *Governor Northam Announces Plans to Postpone Upcoming Virginia Elections in Response to COVID-19* (Apr. 8. 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/april/headline-855995-en.html.

[6] H. 681, 2019-2020 Gen. Assemb., Adjourned Sess. (Vt. 2020).

[7] *See* Declaration of Anne Bannister, attached as Exhibit A.

Amicus believes that the remedy for this as-applied constitutional challenge is for this Court to enjoin enforcement of the Michigan signature requirements for all those candidates who, like plaintiff, (1) do not have the option to qualify for the ballot by paying a $100 fee,[8] and (2) had already filed a "statement of candidacy" or started their petition drive prior to the governor's first stay-home order. If the state wants to adopt less restrictive, achievable methods to qualify for the ballot in light of the COVID-19 pandemic, it is free to institute those measures.

## FACTS

Rather than repeat the facts of the parties, amicus adopts the facts set forth in plaintiff's brief in support of a temporary restraining order and/preliminary injunction except the last two paragraphs. Amicus also notes that the predicament plaintiff finds himself in is shared by numerous candidates of all political persuasions, if the office they seek is not one where the state offers the option of paying a $100 fee to get on the ballot. Those candidates include candidates for city

---

[8] Notably, many candidates for office have the option of dispensing with signature-gathering altogether by paying a $100 fee. Those candidates include for the following offices: Both houses of the state legislature (M.C.L. § 168.163); all county offices, including County Clerk, County Treasurer, Registrar of Deeds, Prosecutor, Sheriff, Drain Commissioner, Surveyor, and Coroner (M.C.L. § 168.193); County Road Commissioner (M.C.L. § 168.254); School Board (M.C.L. § 168.303), and any Township Office (M.C.L. § 168.349).

4

council (as illustrated by the attached declaration of Democrat Anne Bannister) and judicial candidates (as illustrated by the amicus brief of Daniel Finley).

## LEGAL STANDARD

In ruling on a motion for preliminary injunctive relief, a district court must consider the following factors: (1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction. *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994). These four considerations are "factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985), and "no single factor is dispositive," *City of Dearborn v. Comcast of Mich.*, 558 F. Supp. 2d 750, 754 (E.D. Mich. 2008). The same factors are considered on a motion for a temporary restraining order. *See Tocco v. Tocco*, 409 F. Supp. 2d 816, 823-24 (E.D. Mich. 2005).

## ARGUMENT

**THIS COURT SHOULD GRANT THE MOTION FOR INJUNCTIVE RELIEF BECAUSE STRICT ENFORCEMENT OF THE SIGNATURE REQUIREMENT FOR BALLOT ACCESS DURING THE COVID-19 EMERGENCY IS UNCONSTITUTIONAL AND THE BALANCE OF EQUITIES FAVORS PLAINTIFF.**

**A.** **Plaintiff Is Likely to Succeed on the Merits Because Strict Enforcement of the Signature Requirement Rules Burdens Fundamental Rights and There Are Other More Narrowly-Tailored Means to Satisfy State Interests.**

The state may enforce "legitimate" regulations on petition circulation in order to regulate the political process. *Nader v. Blackwell*, 545 F.3d 459, 475 (6th Cir. 2008). This brief does not challenge the constitutionality of Michigan's signature requirements in normal times. The state, of course, has the power to enforce reasonable regulations of the democratic process; indeed, "common sense dictates that substantial regulation of elections is required if they are to be fair and honest." *George v. Hargett*, 879 F.3d 711, 724 (6th Cir. 2018). But in the context of a global pandemic, reasonable requirements have become an unconstitutional barrier.

Challenges to a state's ballot access procedures are evaluated under the *Anderson*/*Burdick* balancing test. *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 585 (6th Cir. 2006). Under that framework, the reviewing court identifies the "character and magnitude of the asserted injury" to the constitutional right before deciding on the level of scrutiny to apply. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). If plaintiffs' rights are "severe[ly]" restricted by the challenged practice, the regulation is subject to strict scrutiny. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). On the other hand, "minimally burdensome and nondiscriminatory" regulations are reviewed in a manner "closer to rational basis." *Ohio Council 8 Am. Fed'n of State, Cty. & Mun. Emps. v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016)

(quoting *Burdick*, 460 U.S. at 434). "Further, if the regulation falls somewhere in between the two extremes, 'the burden on the plaintiffs [is weighed] against the state's asserted interest and chosen means of pursuing it.'" *Id.* (quoting *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 546 (6th Cir. 2014)).

### 1. Enforcing the signature rules during the pandemic severely burdens constitutional rights.

Allowing Michigan to exclude from the ballot candidates who do not submit nominating petitions with the specified number of signatures by April 21 implicates "two different, although overlapping, kinds of rights — the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). Candidates, including incumbents, who in good faith waited until warmer weather to begin or scale up signature-gathering efforts will be denied a spot on the ballot. Their supporters will not have an opportunity to "band together in promoting among the electorate candidates who espouse their political views." *California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000).

In light of COVID-19 and the rapid statewide adoption of social distancing measures, Michigan's requirement that candidates gather signatures on nominating petitions severely burdens candidates' aforementioned rights. Even in the absence of a global pandemic, Michigan's signature requirements have been subject to strict scrutiny when they have prevented candidates from appearing on the ballot. *See*

*Graveline v. Benson*, __ F. Supp. 3d __, No. 18-12354, 2019 WL 7049801 (E.D. Mich. Dec. 22, 2019) (applying strict scrutiny to Michigan's requirement that independent candidates for Attorney General gather 30,000 signatures in 180 days). During the current crisis, Michigan's insistence on enforcing the deadline will keep perfectly viable candidates for political office off the ballot because they had not collected the required signatures by April 21. This, in turn, will deny supporters of those candidates their associational right to support a candidate of their choice, and will limit the ability of all voters to cast a meaningful ballot for one of a variety of candidates. "The hallmark of a severe burden is exclusion or virtual exclusion from the ballot." *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016).

### 2. The state's interests are legitimate, but not compelling, when viewed in the light of present circumstances.

Because the state regulations of the electoral process here have imposed severe burdens on candidates and voters, these measures can be justified only if they are "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434.

The state has a well-recognized interest in ensuring that candidates have "substantial support in order to qualify for a place on the ballot," *Anderson*, 460 U.S. at 787 n.9; *see also Libertarian Party of Ky.* 835 F.3d at 577, and in "the 'orderly administration' of elections," *Mays v. LaRose*, 951 F.3d 775, 787 (6th Cir. 2020) (quoting *Crawford v. Marion Cty. Election Bd.*, 533 U.S. 181, 196 (2008)).

Nonetheless, the state cannot use such interests to justify excluding candidates from the ballot in its refusal to adapt to unprecedented conditions created by a global pandemic.

No matter how legitimate or even compelling a state's electoral interests may appear, a court must evaluate whether the interests are "*in the circumstances of this case*, compelling." *California Democratic Party*, 530 U.S. at 584 (emphasis in original). The life-threatening and uncertain nature of present circumstances warrant exceptionally strong consideration. Under typical conditions, a candidate's ability to obtain a significant number of signatures from voters in their community would be a valid indication that they have earned the "modicum of support" required to appear on the ballot. *Jenness v. Fortson*, 403 U.S. 431, 442 (1971). But today, a candidate's ability to collect the requisite signatures speaks only to their willingness to violate the state's directives while potentially jeopardizing the health of the very constituents they hope to represent. And, as shown below, there are numerous other means to satisfy the state's interest than through strict adherence to its signature rules.

The state's own laws call into question whether a signature requirement is a compelling state interest. Indeed, candidates for a slew of elected offices in Michigan have no signature requirement at all. To appear on the ballot, partisan candidates for

state senator and state representative,[9] county commissioner,[10] county clerk,[11] prosecutor,[12] sheriff,[13] and school board[14] can simply pay a $100 filing fee instead, no matter the size of the constituency they will serve.

Defendants suggest that the April 21 deadline ensures that the state has "sufficient time to canvass petitions, provide a challenge period, and meet the ballot certification deadline." Response at 17. However, Michigan's own Secretary of State has called on the Governor to push the deadline back to May 12, presumably having determined that the state can meet its legal duties under the revised timeline.[15] The state's administrative concerns and desire to strictly enforce generally applicable deadlines appear callous and arbitrary when viewed in the light of a public health crisis. Certainly, these concerns are not compelling.

---

[9] M.C.L. § 168.163.

[10] M.C.L. § 168.193.

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] M.C.L. § 168.303.

[15] Lauren Gibbons, *Without Deadline Extension, Coronavirus Could Keep Some Michigan Political Candidates Off the Ballot*, MLIVE (Mar. 27, 2020), https://www.mlive.com/public-interest/2020/03/without-deadline-extension-coronavirus-could-keep-some-michigan-political-candidates-off-the-ballot.html.

>    3.    **Strict adherence to the signature rules is not the least drastic means to advance state interests under present circumstances.**

Even if the state's interests were compelling, the state has failed to use narrowly tailored means of advancing those interests during the pandemic. A state must utilize "the least drastic means" to achieve its electoral interests, with this tailoring requirement being "particularly important where restrictions on access to the ballot are involved." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 185 (1979). Michigan, however, is insisting on rigidly applying rules that make it virtually impossible for candidates to appear on the ballot under present circumstances, for reasons that are entirely divorced from the underlying state interests.

Identifying the recent actions taken by other states illuminates Michigan's poor tailoring under the same circumstances. Other states, faced with the same COVID-19-related electoral difficulties, have found common-sense ways to effectuate their interest in ensuring substantial community support and efficient electoral administration while adapting to the current crisis. A non-exhaustive list of the options potentially available to Michigan includes:

>    1.    **Allowing electronic signatures.** On March 19, New Jersey announced that it would allow nominating petitions to be signed and verified

11

electronically.[16] On March 26, Utah followed suit.[17] And, on April 6, Florida became the third state to make the change.[18] The State Bar of Michigan has also adopted this approach for its nomination petition procedures for organizational leadership and the Judicial Tenure Commission.[19]

2. **Reducing the signature requirements.** On March 14, New York reduced the number of signatures required to qualify for the ballot by 70%.[20] Similarly, on March 25, a Virginia court granted a U.S. Senate candidate's motion for preliminary injunction[21] against the state's enforcement of a 10,000 signature requirement.[22] The court described

---

[16] *Governor Murphy Announces Changes to Upcoming New Jersey Elections in Response to COVID-19* (Mar. 19, 2020), https://www.nj.gov/governor/news/news/562020/20200319a.shtml.

[17] *Gov. Herbert Suspends Sections of Utah Statute Regarding Signature Gathering* (Mar. 26, 2020), https://governor.utah.gov/2020/03/26/gov-herbert-suspends-sections-of-utah-statute-regarding-signature-gathering/.

[18] *Secretary of State Laurel M. Lee Announces Business Annual Report Filing Deadline Extension and Changes to Candidate Petition and Qualifying Processes* (Apr. 6, 2020), https://dos.myflorida.com/communications/press-releases/2020/secretary-of-state-laurel-m-lee-announces-business-annual-report-filing-deadline-extension-and-changes-to-candidate-petition-and-qualifying-processes/.

[19] State Bar of Mich., *2020 SBM Election Information* (Mar. 30, 2020), https://www.michbar.org/News/NewsDetail/nid/5688/2020-SBM-Election-Information.

[20] *Amid COVID-19 Pandemic, Governor Cuomo Signs Executive Order Temporarily Modifying Election Procedures to Reduce Spread of Coronavirus* (Mar. 14, 2020), https://www.governor.ny.gov/news/amid-covid-19-pandemic-governor-cuomo-signs-executive-order-temporarily-modifying-election.

[21] *Faulkner for Virginia v. Va. Dep't of Elections*, No. CL 20-1456 (Va. Cir. Ct. Mar. 25, 2020) (order granting preliminary injunction), attached as Exhibit B.

[22] *See* Va. Dep't of Elections, HOW TO RUN FOR UNITED STATES SENATE 11 (Apr. 2020), https://www.elections.virginia.gov/media/candidatesandpacs/Senate.pdf (articulating a 10,000 person signature requirement for U.S. Senate candidates).

that "the circumstances as they exist in the Commonwealth of Virginia and across the United States are not normal right now," such that the signature requirement would be subject to strict scrutiny.[23] With the state's consent, the court ordered that the state accept the primary election candidacy of all Republican candidates with 3,500 signatures.[24]

3. **Postponing primaries.** On April 8, Virginia announced that it was consolidating May special elections with the November general election, as well as delaying June primaries by two weeks.[25] Sixteen other states have postponed Presidential primaries in response to COVID-19.[26]

4. **Eliminating the signature requirement entirely.** On March 31, Vermont fully suspended its nominating petition requirement for elections in 2020.[27] As discussed above, even in Michigan candidates for state house and senate and county offices are able to dispense with the signature requirement by paying a $100 fee.

These measures were adapted to give candidates flexibility and protect the electorate's rights while encouraging precaution during dangerous times. Indeed, Michigan itself has already recognized the dangers posed by taking a business-as-

---

[23] *Faulkner for Virginia*, No. CL 20-1456, at *2-*3.

[24] *Id.* at *4.

[25] *Governor Northam Announces Plans to Postpone Upcoming Virginia Elections in Response to COVID-19* (Apr. 8. 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/april/headline-855995-en.html.

[26] Nick Corasaniti & Stephanie Saul, *16 States Have Postponed Their Primaries Because of Coronavirus. Here's A List.*, N.Y. TIMES (Apr. 13, 2020), https://www.nytimes.com/article/2020-campaign-primary-calendar-coronavirus.html.

[27] H. 681, 2019-2020 Gen. Assemb., Adjourned Sess. (Vt. 2020).

usual approach to elections: over two weeks ago, Governor Whitmer signed an executive order allowing cities and counties to delay the May election until November, encouraging absentee voting, and suspending strict compliance with some election administration laws.[28] Despite that order, Michigan has failed to implement any changes to the April 21 signature-collection deadline. By failing to adopt any of the changes that other states have pioneered and found workable, the state will effectively bar plaintiff and other candidates from appearing on the ballot.

Nor has Michigan pursued other obvious measures that would ease signature gathering. For example, the state could suspend the requirement that nomination petitions be printed on 8.5'' by 14'' paper, instead allowing for printing on standard 8.5'' by 11'' paper. M.C.L. § 168.544c. Rather than forcing candidates to mail irregularly sized petitions to supporters' homes, this change would allow supporters to print their own petitions at home, substantially easing the burden of signature collection via mail repeatedly endorsed by the state. Response at 13.

The state could likewise suspend the requirement that petitions be physically witnessed by circulators. On April 9, Governor Whitmer signed an executive order suspending the statutory requirement that notaries be physically present to witness a

---

[28] *Governor Whitmer Signs Executive Order Expanding Absentee Voting in May 5 Elections* (Apr. 8, 2020), https://www.michigan.gov/whitmer/0,9309,7-387-90499_90640-523402--,00.html.

document's signing.[29] Instead, the order allows notaries to witness signings via video conferences.[30] If notaries can virtually witness the signing of wills, affidavits, and powers of attorney without compromising the validity of those documents, then surely nominating petitions can be signed virtually as well.

To be clear, amicus is not specifically endorsing any of the above alternatives, nor should the Court feel compelled to do so. They merely illustrate the basic point that less restrictive alternatives exist that would impose less severe burdens on candidates' and voters' rights while still furthering the state's asserted interests. That is enough to render the signature collection requirement in its current form, at the current time, unconstitutional.

Defendants argue that candidates' ability to mail petitions to potential signatories is enough to mitigate the burden that the April 21 deadline and the stay-home orders collectively place on candidates' rights, but this is not so. As the state acknowledges, the mailing option is far more expensive than in-person signature gathering. Response at 13. The state compares the burden created by the mail option to other, more typical burdens borne by candidates hoping to be listed on the ballot,

---

[29] *Governor Whitmer Signs Executive Order Removing Barriers to Remote Transactions and Estate Planning* (Apr. 8, 2020), https://www.michigan.gov/whitmer/0,9309,7-387-90499_90640-525060--,00.html.

[30] *Id.*

but the mailing option presents far greater challenges.[31] As the Sixth Circuit has stated, requiring candidates "to allocate additional campaign resources to gather signatures" without a compelling reason "can be an injury to First Amendment rights." *Nader*, 545 F.3d at 471. Although expense alone may not be a severe burden, financial costs coupled with an unreasonable time frame under which petitions must be sent, signed, and returned serves to unconstitutionally deny candidates a place on the ballot.[32]

Defendants likewise point to a candidate's ability to mount a write-in campaign to minimize the burden of not appearing on the ballot. Yet the opportunity

---

[31] *See* Daniel Hays Lowenstein & Robert M. Stern, *The First Amendment and Paid Initiative Petition Circulators: A Dissenting View and A Proposal*, 17 HASTINGS CONST. L.Q. 175, 206 (1989) ("Direct mail is much more expensive than paid petition circulators. Recipients are not likely to sign and return the petitions . . . . Whereas the course of least resistance in a shopping mall may be to sign when asked, signing and returning a petition by mail takes significantly more effort than throwing away the solicitation letter.").

[32] By illustration, United States Census forms were mailed to every home in the country in mid-March, and the federal government imposes a legal obligation upon residents to complete the survey. 13 U.S.C. § 221. Despite having a legal duty and the convenient option to fill out the census online, fewer than 55% of Michigan households have responded. In contrast, it cannot be doubted that a candidate who sends out petitions to the registered voter list with a request for signature and return on a tight timeline will be less successful than the federal government. The theoretical option to indiscriminately mail hundreds or thousands of petitions to Michigan residents, with a request that the resident voluntarily sign the form and mail it back, does not meaningfully reduce the burden that the state has imposed on candidates' ability to access the ballot.

to launch a write-in campaign cannot replace ballot access. *Lubin v. Panish*, 415 U.S. 709, 719 n.5 (1974) ("[T]he realities of the electoral process . . . strongly suggest that 'access' via write-in votes falls far short of access in terms of having the name of the candidate on the ballot."); *Anderson*, 460 U.S. at 799 n.26 ("We have previously noted that [a write-in] opportunity is not an adequate substitute for having the candidate's name appear on the printed ballot.").[33]

In short, the state's stubborn adherence to the signature requirement rules flunks the least-drastic-means test in light of the many other alternatives that are not only available, but some of which have in fact been adopted by other states.

### 4. Even if strict adherence to the signature rules were not a severe burden on plaintiff's rights, it would still not survive intermediate scrutiny.

"[R]egulations that impose a more-than-minimal but less-than-severe burden . . . require a 'flexible' analysis, 'weighing the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it.'" *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016) (quoting *Green Party*, 791 F.3d at 693). As argued above, given the pandemic, the burden imposed on candidates and voters here is severe. But even if the burden here were simply "more-than-minimal," the

---

[33] It defies reason to suggest that a candidate like Ann Arbor City Council member Anne Bannister, who received 92.8% of the vote in the last election, has failed to demonstrate community support merely because a pandemic has rendered what was once a relatively easy task nearly impossible. Bannister Declaration, Exhibit A, at 3.

signature requirement, as applied, still flunks the intermediate-scrutiny test. As demonstrated in detail above, the state has so many options that would adequately advance its interests without depriving candidates and voters of their rights, that the balance tips in favor of plaintiff.

### B.    Plaintiff and Others Will Suffer Irreparable Harm Absent an Injunction.

The state's strict enforcement of the nominating petition signature requirement by the April 21 deadline will cause irreparable harm. A candidate's First Amendment rights are implicated in ballot-access challenges. *See Nader*, 545 F.3d at 475 (holding that application of an unconstitutionally restrictive ballot access statute to a candidate's petition circulators violated that candidate's First Amendment rights). When First Amendment rights are violated, irreparable harm is certain. *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 412 (6th Cir. 2014) ("[I]t is well-settled that loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." (citing *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)); *see also ACLU of Ky. v. McCreary Cty.*, 354 F.3d 438, 445 (6th Cir. 2003) ("if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated").

In addition to causing irreparable harm to plaintiff and similarly situated candidates, the state will cause irreparable injury to Michigan voters by depriving them of their First Amendment rights. Although Defendants are correct in asserting

that a voter does not have an "absolute right to vote for a candidate of her choice," a candidate's ability to appear on the ballot "affects the First Amendment rights of voters." *Libertarian Party of Ohio v. Blackwell*, 462 F.3d at 588.

Therefore, both plaintiff and others will be harmed absent an injunction.

### C.    The Public Interest Would Suffer If an Injunction Is Not Entered Because Voters Would be Deprived of Their First Amendment Rights, and the Health and Safety of the Public Could Be Needlessly Put at Risk.

The public interest weighs in favor of injunctive relief for two reasons. First, "[w]hen a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." *ACLU Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 649 (6th Cir. 2015).

Second, and perhaps more alarming, if an injunction is not entered, the state's adherence to the signature requirement would undermine the public interest by potentially placing the health and safety of Michiganders at risk. *See Malam v. Adducci*, __ F. Supp. 3d __, No. 20-10829, 2020 WL 1672662, at *13 (E.D. Mich. Apr. 6, 2020) ("Protecting public health and safety is in the public interest.").

As this case illustrates, many candidates who did not collect all the required signatures before the pandemic hit will not make the ballot. But there are some candidates and their supporters who, feeling that the state has left them with no viable choice, have already resorted to in-person signature collection during this

19

state of emergency as the April 21 deadline approaches. *See* Ex. A, Declaration of Anne Bannister, ¶¶ 30-36. This predictable result could place petition circulators, petition signers, their respective families, and the general public at risk. And, sadly, it could undermine the state's otherwise laudable efforts to halt the human and economic devastation caused by the pandemic.

In short, any administrative burden on the state in accommodating constitutional rights during a pandemic pales in comparison to the potential harm to candidates, voters, and the general public health of Michigan residents if an injunction is not issued. The public interest weighs strongly in favor of relief.

## CONCLUSION AND RECOMMENDED RELIEF

Plaintiff's motion for a temporary restraining order and preliminary injunction should be granted. Amicus believes that the proper remedy for this as-applied constitutional challenge is for this Court to:

1. Declare that, in light of the emergency circumstances brought about by the COVID-19 pandemic, the nominating petition signature requirements to qualify for the ballot in Michigan impose an unconstitutionally severe burden on those political candidates who do not have the option to qualify for the ballot by paying a $100 fee, and are therefore void.

2. Issue an injunction against enforcement of the signature requirements for such candidates.

3. Make it clear that the state is free to institute other narrowly tailored requirements to advance its legitimate interests during the pandemic— subject, of course, to another constitutional challenge.

4.     Limit the ruling to those candidates who filed their "statement of candidacy" or started their petition drive before Governor Whitmer's first stay-home order so as to (a) prevent individuals who had no demonstrated intention of running for office before the pandemic hit Michigan from taking advantage of this Court's order after the fact, and (b) advance the state's interest in ensuring that the ballot contain only serious candidates.

5.     Make it clear that the ruling applies to all candidates facing the same problem as plaintiff in order to prevent serial litigation, avoid inconsistent results among similarly situated candidates, and achieve a global resolution of the unconstitutional application of signature requirements during the global pandemic.

6.     Make it clear that the Court's ruling applies only to the current election cycle.

Respectfully submitted,

/s/ Michael J. Steinberg
Michael J. Steinberg (P43085)
Katie Chan*
Diane Kee*
Brian Remlinger*
Civil Rights Litigation Initiative
University of Michigan Law School
701 South State Street, Suite 2020
Ann Arbor, MI 48109
(734) 615-2407
mjsteinb@umich.edu

/s/ Daniel S. Korobkin
Daniel S. Korobkin (P72842)
American Civil Liberties Union Fund
  of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6824
dkorobkin@aclumich.org

  * Student attorneys practicing
  pursuant to L.R. 83.21

Attorneys for Amicus Curiae

Dated: April 14, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2020, I filed this document using the ECF system, which will send electronic notice of this filing to all counsel of record.

/s/ Daniel S. Korobkin
Daniel S. Korobkin (P72842)
American Civil Liberties Union Fund
  of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6824
dkorobkin@aclumich.org