UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **ERIC ESSHAKI**, as candidate for United States Congress and in his individual capacity;<br>**MATT SAVICH**, as candidate for the Forty-Seventh District Court, Oakland County, Michigan and in his individual capacity;<br>**DEANA BEARD**, as candidate for the Third Circuit Court Judge, Regular Term, Non-Incumbent Position in Wayne County and in her individual capacity.<br><br>        Plaintiffs,<br><br>    vs.<br><br>**GRETCHEN WHITMER**, Governor of Michigan;<br>**JOCELYN BENSON**, Secretary of State of Michigan; and<br>**JONATHAN BRATER**, Director of the Michigan Bureau of Elections, in their official capacities,<br><br>        Defendants. | **2:20-CV-10831-TGB**<br><br><br>**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** |

In normal times, a candidate for United States Congress in Michigan's Eleventh Congressional District must collect one thousand signatures from registered voters in order to have his or her name appear

1

on the primary ballot.  Candidates typically gather these signatures door-to-door, or in high-traffic public places like outside malls, grocery stores, crowded school or community events, public rallies, or places of worship.  Under Michigan's statute, the signatures are due on the fifteenth Tuesday before the August 4th primary.  This year, signatures are due on April 21, 2020.

Unfortunately, these are not normal times.  On March 10, 2020, Michigan Governor Gretchen Whitmer declared a state of emergency based on the serious threat to public safety posed by the COVID-19 or "coronavirus" pandemic.  In less than four months, since the first reported case of the disease on American soil in January,[1] this highly contagious novel virus has taken the lives of more than thirty-four thousand Americans, of whom more than two thousand were residents of the State of Michigan.[2]  In addition to causing thousands of deaths, the pandemic has upended the daily routines of hundreds of millions as they

---

[1] Michelle L. Holshue, et al., *First Case of 2019 Novel Coronavirus in the United States*, 382 New Eng. J. Med. 929 (2020).

[2] *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times (Apr. 19, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last accessed Apr. 19, 2020).

sheltered at home, causing one in four small  businesses to close,[3] and 22 million Americans to lose their jobs.[4]  Since March 23, 2020, pursuant to Executive Order 2020-21, the State of Michigan has been on lockdown: all nonessential in-person work has been prohibited, as have all public and private gatherings of persons not part of the same household.  Malls are closed, schools and churches have moved to social media solutions such as Zoom, and any candidate trying to canvass door-to-door to attempt to gather signatures today would be committing a misdemeanor offense.

Yet, the State insists on enforcing the signature-gathering requirements as if its Stay-at-Home Order responding to the ongoing pandemic had no impact on the rights of candidates and the people who may wish to vote for them.  The plaintiff[5] in this matter, Eric Esshaki, is running   for   United   States   Congress   in   Michigan's   Eleventh

---

[3]   *Special Report on Coronavirus and Small Business,* U.S. Chamber of Comm. & MetLife, Apr. 3, 2020.

[4]   Heather Long, *U.S. now has 22 million unemployed, wiping out a decade of job gains*, Wash. Post (Apr.   16,   2020),   https://www.washingtonpost.com/business/2020/04/16/unemployment-claims-coronavirus/?outputType=amp.

[5]   Since oral argument on April 15, 2020, the Court has granted emergency motions to intervene from two additional plaintiffs, Mr. Savich and Ms. Beard.  Both allege that their legal positions are substantively identical to Mr. Esshaki, but because of the emergency nature of these proceedings, Defendants have not yet had opportunity to respond to Mr. Savich's or Ms. Beard's allegations specifically. Accordingly, this Order focuses primarily on Mr. Esshaki's arguments, and refers to him as "Plaintiff".

Congressional District.  He states that he has gathered more than seven hundred of the one thousand signatures he needs to get on the primary ballot.  He contends that because of the Stay-at-Home Order, he was effectively prohibited from collecting the remaining three hundred signatures he needed in time to meet the April 21 deadline, and that consequently he will be barred from having his name appear on the primary ballot.  Under these unique historical circumstances, as will be explained in detail below, the Court finds that the State's actions in the form of enforcing both the Stay-at-Home Order and the statutory ballot-access requirements, operate in tandem to impose a severe burden on Plaintiff's ability to seek elected office, in violation of his First and Fourteenth Amendment rights to freedom of speech, freedom of association, equal protection, and due process of the law.  Consequently, the Motion for Preliminary Injunction will be granted.

## I.    BACKGROUND

Plaintiff Eric Esshaki is a registered nurse and practicing attorney running as a Republican candidate for United States Congress in Michigan's Eleventh Congressional District.  Compl. ¶ 2, ECF No. 1, PageID.2.  He filed his statement of candidacy with the Federal Election

Commission on October 31, 2019.  *Id.* ¶ 18, PageID.5.  He is required by statute to collect one thousand valid signatures from registered voters by April 21, 2020 to qualify to have his name placed on the August 4, 2020 primary ballot.  Mich. Comp. Laws §§ 168.133, 168.544f (collectively "the signature requirement").  By March 23, 2020, Esshaki's campaign had already collected approximately seven hundred signatures.  Compl. ¶ 22, ECF No. 1, PageID.6.

On March 10, 2020, Michigan's first two COVID-19 cases were announced and Governor Gretchen Whitmer declared a state of emergency.  *See* Mich. Exec. Order 2020-4 (Mar. 10, 2020) ("State of Emergency Declaration").  The State of Emergency Declaration cautioned citizens that COVID-19 "is a respiratory disease that can result in serious illness or death . . . and can easily spread from person to person."  *Id.*  By March 23, 2020, the number of diagnosed coronavirus cases in Michigan had grown to more than nine hundred and thirteen[6] and the Governor signed Executive Order 2020-21 (the "Stay-at-Home Order").  The Stay-at-Home Order suspended in-person non-essential commercial activities and directed residents to "remain at home or in their place of residence

---

[6]   *Daily Counts*, Michigan.gov, https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173_99207---,00.html (last accessed Apr. 17, 2020).

to the maximum extent feasible."  Mich. Exec. Order No. 2020-21 (Mar. 23, 2020).  It also prohibited all "public and private gatherings of any number of people" not part of a single household and ordered that persons performing essential activities outside of their homes remain six feet apart.  *Id.*  The Stay-at-Home Order does not contain any exception for campaign workers.  On April 9, 2020, the Governor signed a second executive order extending the Stay-at-Home Order through the end of April.  *See* Mich. Exec. Order No. 2020-42 (Apr. 9, 2020).  A violation of the Stay-at-Home Order is a misdemeanor criminal offense.  *Id.*; Mich. Comp. Laws § 10.33.

Plaintiff and the numerous candidates who have expressed an interest in the outcome of this case[7] maintain that the Stay-at-Home Order has for all practical purposes denied them the opportunity to

---

[7] The Court has received a number of amicus curiae briefs and motions to intervene from other candidates who, like Plaintiff, say they have been unable to gather signatures because of the Stay-at-Home Order.  They include: Mr. Daniel Finley, a judicial candidate for Michigan's Twenty-Second Circuit (ECF No. 13), Mr. Matt Savich, a judicial candidate for Michigan's Forty-Seventh District Court (ECF No. 11), Ms. Deana Beard, a judicial candidate for Michigan's Third Circuit Court (ECF No. 17), and Mr. Kyle Kopitke, an independent presidential candidate (ECF No. 18). In addition, the American Civil Liberties Union filed an amicus curiae brief in support of Plaintiff (ECF No. 15), and Ms. Whittney Williams, a competitor of Mr. Esshaki also seeking to run as the Republican candidate for United States Congress in Michigan's Eleventh Congressional District, filed an amicus curiae brief opposing relief for Plaintiff (ECF No. 21).  The Court also received correspondence from Mr. Bob Carr, a Republican candidate for U.S. Senate, who provided a list of candidates that he appeared to be citing as similarly situated, but provided no evidentiary support for his claim.  By separate order, the Court will grant these pending motions to intervene and file amicus briefs, with the exception of the motion of proposed Plaintiff Kopitke, because the relief he seeks differs significantly from that of the other candidates.

collect the signatures that they needed during the timeframe between March 23 and April 21. Mot. for Prelim. Inj., ECF No. 2, PageID.50. Plaintiff contends that the combination of the State's strict enforcement of statutory signature gathering requirements with the Governor's Stay-at-Home Order has placed a severe burden on his ability to run for elected office—in violation of the freedom of speech, freedom of association, equal protection, and due process rights guaranteed to him by the First and Fourteenth Amendments. Compl. ¶ 46, ECF No. 1, PageID.11. Plaintiff argues that the burden placed on him by the State's actions is unconstitutional because the State has neither a compelling interest in enforcing the signature requirement, nor has it narrowly tailored its ballot access requirements to effectuate any compelling interest it may have. ECF No. 2, PageID.55.

Defendants contend that enforcement of the signature requirement in light of the Governor's Stay-at-Home Order has only moderately burdened Plaintiff's ability to run for elective office. Defs. Resp., ECF No. 6, PageID.112. Defendants argue that Plaintiff entered the race relatively late, that he was not diligently collecting signatures before the Stay-at-Home Order was issued, that he should have "doubled down" on

his signature-collection efforts during the period between the March 10th State of Emergency Declaration and the March 23rd Stay-at-Home Order, that he could have collected signatures by mail, and that even if he fails to get on the ballot, he can always run as a write-in candidate. *Id.* at PageID.110-12.

Defendants assert that any burden placed on Plaintiff's ability to run for elective office by the enforcement of the State's signature requirements must be weighed against the State's substantial interest in ensuring that candidates have a significant modicum of support before their names are printed on the ballot.  *Id.* at PageID.113.  Defendants argue that a threshold showing of support through signature gathering helps protect the integrity of the electoral process by limiting the number of candidates on the ballot and avoiding voter confusion.  *Id.*  Defendants further assert that the State has an interest in maintaining April 21, 2020 as the filing deadline because that date "ensur[es] that the Secretary of State and her staff have sufficient time to canvass petitions, provide a challenge period, and meet the ballot certification deadline, which triggers final preparations for ballot printing by the counties."  *Id.* at PageID.115.

8

The Court heard oral argument on this motion on April 15, 2020, utilizing the social media platform Zoom.  At the hearing, both parties referenced proposed remedies that each had submitted to the Court *in camera*.  Plaintiff seeks an order reducing the required number of signatures by forty percent, so that candidates would only need to collect sixty percent of the required number.  Defendants proposed postponing the filing date to May 8, 2020, and offering candidates an approved method to collect signatures by e-mail, and submit them using the Internet, but they opposed any reduction in the required number of signatures.  The Court will consider these proposed remedies together with the relevant facts and applicable law in reaching its decision.

## II.   LEGAL STANDARD

### a. Preliminary Injunction

The Court must consider four factors when ruling on a motion for a preliminary injunction: (1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm absent the injunction; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is

advanced by the issuance of the injunction. *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012). No one factor is dispositive; rather the court must balance all four factors. *In re De Lorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). A preliminary injunction is an extraordinary remedy that will only be granted if Plaintiff shows that circumstances clearly demand it. *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

## III.  DISCUSSION

### a. Likelihood of Success on the Merits

Under Michigan election law, candidates for certain elective offices must comply with statutory signature gathering requirements enumerated in Section 168.544f. Mich. Comp. Laws § 168.544f. The number of signatures required depends on the population of the district and whether or not that candidate is running as a member of a party. Mich. Comp. Laws § 168.544f. Congressional candidates are also governed by Section 168.133, which sets the April 21, 2020 filing deadline. Mich. Comp. Laws § 168.133. Substantially similar statutes set April 21, 2020 as the petition filing date for other offices. *See, e.g.*, Mich. Comp. Laws § 168.93 (U.S. Senator); Mich. Comp. Laws § 168.93

(judge of Circuit Court); Mich. Comp. Laws § 168.467b (judge of District Court).

While there is no fundamental right to run for elective office, the Supreme Court has recognized that ballot access laws such as Sections 168.133 and 168.544f "place burdens on two different, although overlapping, kinds of rights – the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968). Ballot access restrictions affect candidates and individual voters alike because absent recourse to state-wide proposals or referenda, "voters can assert their preferences only through candidates or parties or both." *Lubin v. Panish*, 415 U.S. 709, 716 (1974). "By limiting the choices available to voters, the State impairs the voters' ability to express their political preferences." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). As the Supreme Court explained in the seminal ballot access case of *Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983), "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws

that affect candidates always have at least some theoretical correlative effect on voters." (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)).

When considering the constitutionality of ballot access laws, courts apply the framework established in *Anderson*, 460 U.S. at 780 as later refined in *Burdick v. Takushi*, 504 U.S. 428 (1992). Under the *Anderson-Burdick* framework, courts first look at the "character and magnitude of the asserted injury" to the plaintiff's constitutional rights. *Anderson*, 460 U.S. at 789. "When a state promulgates a regulation which imposes a 'severe' burden on individuals' rights, that regulation will only be upheld if it is 'narrowly drawn to advance a state interest of compelling importance'" *Lawrence v. Blackwell*, 430 F.3d 368, 373 (6th Cir. 2005) (quoting *Burdick*, 504 U.S. at 434). The analysis requiring that a state law be narrowly tailored to accomplish a compelling state interest is known as the "strict scrutiny" test. If regulations enacted do not seriously burden a plaintiff's rights, a state's important regulatory interests will typically be enough to justify "reasonable, nondiscriminatory restrictions." *Anderson*, 460 U.S. at 788. Regulations falling somewhere in between—"i.e., regulations that impose a more-than-minimal but less-than-severe burden—require a 'flexible' analysis,

12

'weighing the burden on the plaintiffs against the [s]tate's asserted interest and chosen means of pursuing it.'" *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016) (quoting *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 546 (6th Cir. 2014)).  This level of review is called "intermediate scrutiny."

### *i.  Severity of the burden on Plaintiff*

In this case, Plaintiff is challenging neither the constitutionality of the State's ballot access laws nor the Governor's Stay-at-Home Order in isolation.  Rather, Plaintiff seeks relief because the two regulations, taken together, have prevented him from collecting enough signatures before the April 21, 2020 deadline to get his name on the primary ballot. *See Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 586 (6th Cir. 2006) ("Our inquiry is not whether each law individually creates an impermissible burden but rather whether the combined effect of the applicable election regulations creates an unconstitutional burden on First Amendment rights."); *Graveline v. Johnson*, 336 F. Supp. 3d 801, 810 (E.D. Mich. 2018) (considering "the 'combined effect' of the challenged regulations, rather than each statute's requirement by itself").  Plaintiff argues that the burden put on him by the two regulations is severe,

necessitating a strict scrutiny analysis. ECF No. 1, PageID.11. Defendants contend that the burden is moderate, necessitating a "flexible" weighing of the burdens analysis, or "intermediate scrutiny." ECF No. 6, PageID.110.

Defendants proffer four separate reasons why the burden on Plaintiff is not severe. Upon close examination, none is convincing. First, Defendants argue that Plaintiff has not been diligent in collecting signatures because, at the time the March 23rd Stay-at-Home Order was issued, he had only collected seven hundred of the one thousand he is required to obtain. ECF No. 6, PageID.110. Defendants offer little evidence to support this assessment. The State refers to information available on its website showing a list of those candidates who have successfully met the current filing requirements.[8] But the relevant question pertains to those candidates who have declared their intentions to qualify for the ballot, but have not yet met the filing requirements at the time the Stay-at-Home Order went into effect. The State could have conducted a survey to determine where those candidates were in the signature collection process as of the date of the shut-down, but no such

---

[8] *2020 Michigan Candidate Listing*, Mich. Sec'y of State, https://miboecfr.nictusa.com/election/candlist/2020PRI_CANDLIST.html (last accessed Apr. 19, 2020).

information has been proffered.  It is not enough to merely assert that a candidate's successful collection of seventy percent of the requisite signatures with twenty-nine days left to go is somehow evidence of dilatory behavior.  Moreover, during oral argument on this matter, Plaintiff indicated that he had campaign events planned for late March and April that had to be canceled after the Stay-at-Home Order was issued.  Other candidates as well have submitted testimony that they likewise had planned to ramp up signature collection efforts in March and April, when warmer spring weather would accommodate outdoor activities and be more conducive to large social gatherings and door-to-door canvassing.  *See* Bannister Decl. ¶ 10, ECF No. 15-2, PageID.273-74; Amicus Br. of Daniel P. Finley, ECF No. 13, PageID.212; Deana Beard Mtn. for Joinder, ECF No. 17, PageID.296; *see also Jones v. McGuffage*, 921 F. Supp. 2d 888, 897 (N.D. Ill. 2013) (noting that burden on candidates increased when signature gathering period for special election was truncated by one-third and limited to "December and January— months during which weather in the Chicago area is particularly inclement and in which there are a dearth of large scale, outdoor, public events during which signature drives are most successful").

15

Second, Defendants contend that the Governor's March 10, 2020 State of Emergency Declaration "should have acted as a wake-up call to Plaintiff and his staff to double-down on signature collection efforts" before the March 23, 2020 Stay-at-Home Order.  ECF No. 6, PageID.111. This argument both defies good sense and flies in the face of all other guidance that the State was offering to citizens at the time.   The Governor's State of Emergency Declaration cautioned citizens that COVID-19 "is a respiratory disease that can result in serious illness or death . . . and can easily spread from person to person."   Mich. Exec. Order 2020-4 (Mar. 10, 2020).  The next day, the State issued a press release urging citizens to "[r]educe in-person gatherings and activities," "consider tele-work[ing]" and limit interactions with vulnerable populations.[9]   Instead of "doubling down" on door-to-door signature collection efforts between March 10th and March 23rd—increasing the risk that Plaintiff and his supporters could possibly be exposed to the COVID-19 virus by engaging in repeated close-contact with potential

---

[9] *State Recommends Community Mitigation Strategies to help slow the transmission of COVID-19 in Michigan*, Michigan.gov (Mar. 11, 2020), https://www.michigan.gov/coronavirus/0,9753,7-406-98158-521463--,00.html.

16

petition signers or unknowingly transmit it to others—prudence at that time counseled in favor of doing just the opposite.

Third, Defendants argue that Plaintiff could have utilized a mail-based campaign to collect the remaining three hundred signatures he needed during the month-long shutdown. ECF No. 6, PageID.111. Plaintiff counters that a mail campaign is both prohibitively expensive and of unproven efficacy. ECF No. 10, PageID.159. He also says that he tried it. Plaintiff states that on April 2, 2020, he sent one thousand petitions by mail at a cost of $1.75 each. ECF No. 10, PageID.159. And by April 14, 2020, the mail campaign had garnered a total of fifteen additional signatures—which, given the cost of the mailing, meant the equivalent of paying approximately $115 per signature. *Id*. At that rate, Plaintiff estimates that it would have cost him an additional $34,500 to gather the remaining three hundred signatures he needed. *See id*. Indeed, if Plaintiff wanted to collect four hundred signatures in order to ensure a safety margin in the event any signatures were later found to be invalid, such a mailing would cost $45,000. *Id*; *see also* Deana Beard Mtn. for Joinder, ECF No. 17, PageID.296 (judicial candidate who estimates that a mail-only campaign for remaining signatures would cost

her $216,450).  A $34,500 expense is a significant financial burden for any congressional campaign.  Further, the unforeseen nature of such an expense here surely magnifies its burden: no candidate, at the time they initially declared for office, could have anticipated that at the end of March, just when in-person signature collecting might be expected to be ramping up, there would arise the sudden need to switch to a mail-only signature campaign.  While Plaintiff is not entitled to free access to the ballot, the financial burden imposed by an unforeseen but suddenly required mail-only signature campaign is far more than an incidental campaign expense or reasonable regulatory requirement.  For any candidate other than those with unusually robust financial means, such a last-minute requirement could be prohibitive.  *Compare Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 577 (6th Cir. 2016) ("the incidental costs of gathering signatures on petitions do not come close to exclusion from the ballot, and thus do not impose a severe burden on ballot access") *with Lubin*, 415 U.S. at 718 (holding that a $701.60 filing fee is an unconstitutional burden on indigent candidate with no alternative mechanism to get his name on the ballot).

Furthermore, though the Court finds that a mail-only campaign for the remaining signatures would impose more than an incidental cost on Plaintiff and candidates like him, in the context of the COVID-19 pandemic, the efficacy of a mail-based campaign is unproven and questionable at best.  Conducting an effective mail campaign in the current environment presents a significant hurdle.  Such a mail-only signature gathering campaign assumes both a fully operational postal service and a public willing to walk to the mailbox, open physical envelopes, sign a petition, and deposit the envelope back into a mailbox or make a trip to the Post Office.  Today, sadly, ample reasons exist to question the plausibility of each of those assumptions.  For one, the United States Postal Service has itself been affected by the COVID-19 virus: As of April 7, 2020, more than 386 postal workers have tested positive for the virus nationwide and mail delays have been confirmed in Southeast Michigan.[10]  Media reports extensively discuss the risks of contracting COVID-19 from mail, suggesting, at least anecdotally, that

---

[10] Justin P. Hicks, *Michigan mail delivery slows as coronavirus hits postal service workers*, Mlive (Apr. 7, 2020), https://www.mlive.com/public-interest/2020/04/michigan-mail-delivery-slows-as-coronavirus-hits-postal-service-workers.html.

the issue may be of widespread public concern or even fear.[11] Getting voters to return signatures by mail in normal times is difficult.[12]  In these unprecedented circumstances, the efficacy of a mail-only signature gathering campaign is simply an unknown.   Forcing candidates—through little fault of their own—to rely on the mails as their only means of obtaining signatures presents a formidable obstacle of unknown dimension.

Fourth, Defendants contend that even if Plaintiff fails to gather sufficient signatures to have his name placed on the August ballot, he remains free to mount a write-in campaign, and like any write-in candidate, he would have that method of access to the ballot, which should be considered adequate.   ECF No. 6, PageID.112.   But this argument has already been rejected both by the Supreme Court and by a court in this district.  *Lubin*, 415 U.S. 719 n.5 ("The   realities   of   the electoral process . . . strongly suggest that 'access' via write-in votes falls

---

[11] *See, e.g.*, Nicola Twilley, *You've Got Mail. Will You Get the Coronavirus?*, N.Y. Times (Mar. 24, 2020), https://www.nytimes.com/2020/03/24/health/coronavirus-mail-packages.html.

[12] *See* Daniel Hays Lowenstein & Robert M. Stern, *The First Amendment and Paid Initiative Petition Circulators: A Dissenting View and A Proposal*, 17 Hastings Const. L.Q. 175, 206 (1989) ("Recipients are not likely to sign and return the petitions . . . . Whereas the course of least resistance in a shopping mall may be to sign when asked, signing and returning a petition by mail takes significantly more effort than throwing away the solicitation letter.").

far short of access in terms of having the name of the candidate on the ballot."); *Anderson*, 460 U.S. at 799 n.26 ("We have previously noted that [a write-in] opportunity is not an adequate substitute for having the candidate's name appear on the printed ballot."); *Graveline*, 336 F. Supp. 3d at 811 (Roberts, J.) (same).

The reality on the ground for Plaintiff and other candidates is that state action has pulled the rug out from under their ability to collect signatures. Since March 23, 2020, traditional door-to-door signature collecting has become a misdemeanor offense; malls, churches and schools and other public venues where signatures might be gathered have been shuttered, and even the ability to rely on the mail to gather signatures is uncertain—if not prohibitively expensive. Absent relief, Plaintiff's lack of a viable, alternative means to procure the signatures he needs means that he faces virtual exclusion from the ballot. After considering Defendants' arguments, this Court has little trouble concluding that the unprecedented—though understandably necessary—restrictions imposed on daily life by the Stay-at-Home Order, when combined with the ballot access requirements of Sections 168.133 and 168.544f, have created a severe burden on Plaintiff's exercise of his free

speech and free association rights under the First Amendment, as well as his due process and equal protection rights under the Fourteenth Amendment[13]—as expressed in his effort to place his name on the ballot for elective office. *See Libertarian Party of Ky.*, 835 F.3d at 574 ("The hallmark of a severe burden is exclusion or virtual exclusion from the ballot."). Accordingly, a strict scrutiny analysis is appropriate here. *See, e.g.*, *Faulkner v. Va. Dep't. of Elections*, CL 20-1456 (Va. Cir. Ct. Mar. 25, 2020) (applying strict scrutiny to candidate's ballot access claim in light of state's COVID-19 restrictions).

## ii. *Defendants' interest in enforcing signature requirements in light of the Stay-at-Home Order*

Because the State's signature requirements, operating in conjunction with the Stay-at-Home Order, have imposed a severe burden on the First and Fourteenth Amendment rights of Plaintiff and other candidates in his position, such measures can be constitutionally justified only if they are "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434.

---

[13] Although Plaintiffs nominally invoke equal protection, due process, and the First Amendment, the specific interests they raise and the nature of their arguments involve First Amendment principles more closely than the equal protection rights of minor party or independent candidates. Accordingly, this Court, like the parties, will view the case mainly as implicating First Amendment rights.

Defendants argue that the State has two separate interests in enforcing Sections 168.133 and 168.544f.  First, the State has a substantial interest in ensuring that candidates have a significant modicum of support before their names are printed on the ballot.  ECF No. 6, PageID.113.  Second, the State has an interest in maintaining the filing deadline of April 21, 2020 because that date "ensur[es] that the Secretary of State and her staff have sufficient time to canvass petitions, provide a challenge period, and meet the ballot certification deadline, which triggers final preparations for ballot printing by the counties."  *Id.* at PageID.115.

The Supreme Court has recognized that states have "an important interest in ensuring that candidates demonstrate a 'significant modicum of support,' before gaining access to the ballot, primarily in order to avoid voter confusion, ballot overcrowding, and frivolous candidacies." *Libertarian Party of Ky.*, 835 F.3d at 577 (quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971)).  Along with enforcing specific deadlines, both regulations are part and parcel of the State's generalized interest in the orderly administration of elections.  *Mays v. LaRose*, 951 F.3d 775, 787 (6th Cir. 2020).

Notably, Defendants do not explicitly contend in their brief that either of the State's proffered interests in strict enforcement of the signature requirements rise to the level of a *compelling* state interest. *See* ECF No. 6, PageID.113-16. Rather, they see them as *important* government interests in the context of today's pandemic that would pass the flexible intermediate scrutiny analysis. At oral argument, however, the State asserted that its interests were compelling, and the Supreme Court has found that ensuring that a candidate has a modicum of support before inclusion on the ballot can be a compelling state interest in other contexts. *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986) . Significantly though, with respect to Section 168.133's April 21, 2020 deadline, the State conceded at oral argument that the signature-gathering due date could be moved back to May 8, 2020 without significant impairment of the State's interests. Clearly any interest in maintaining April 21, 2020 as the signature due date is not, in fact, compelling.

But even assuming the State has a compelling interest in the need to ensure a modicum of support through the enforcement of the signature requirement, the regulatory means to accomplish that compelling

24

interest are not narrowly tailored to the context of the COVID-19 pandemic—as it would need to be to survive a strict scrutiny analysis. This is because under typical conditions, Plaintiff's ability to obtain one thousand signatures from registered voters would be a valid indication that he has earned the "modicum of support" the Michigan Legislature deemed sufficient to appear on the ballot. When setting the requirement at one thousand signatures, the Michigan Legislature intended that candidates be allowed until April 21, 2020—under normal, non-pandemic conditions—to gather one thousand signatures using all of the traditionally effective means to do so. The March 23, 2020 Stay-at-Home Order, for reasons already discussed, effectively halted signature-gathering by traditional means, reducing the available time prescribed by the Michigan Legislature to gather one thousand signatures by twenty-nine days. Thus, a state action narrowly tailored to accomplish the same compelling state interest would correspondingly reduce the signature requirement to account for the lost twenty-nine days. Or, to state it differently, even assuming the State generally has a compelling interest in ensuring candidates have a modicum of support before allowing inclusion on the ballot, here the State has not shown it has a

25

compelling interest in enforcing *the specific numerical requirements* set forth in Section 168.544f in the context of the pandemic conditions and the upcoming August primary.

The State has thus failed to show that its enforcement of the signature requirements in conjunction with the Stay-at-Home Order is both justified by a compelling state interest and narrowly tailored to accomplish that interest in a manner that has the least restrictive impact on Plaintiff's constitutional rights.   It therefore fails to pass a strict scrutiny analysis.   Consequently, Plaintiff has established a likelihood of prevailing on the merits of his First and Fourteenth Amendment claims.

### b. Likelihood That Plaintiff Will Suffer Irreparable Harm Absent Injunctive Relief

The Court next considers whether Plaintiff will suffer irreparable harm in the absence of injunctive relief.   *Bays*, 668 F.3d at 818-19.   "To demonstrate irreparable harm, the plaintiffs must show that . . . they will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated."   *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).

In reviewing the record, the Court concludes that Plaintiff will suffer irreparable harm absent relief.   Ballot access cases such as this

implicate First Amendment rights, and when such fundamental rights are violated—as when a candidate is unconstitutionally deprived of access to the ballot—irreparable harm can be presumed. *See Libertarian Party of Ohio*, 751 F.3d at 412 ("[I]t is well-settled that loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)).

### c. Probability of Harm to Others and Consideration of the Interests of the Public

The remaining factors, "harm to the opposing party and weighing the public interest . . . merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Defendants contend that the State and its citizens will be harmed in two ways if the Court issues an injunction. First, the State and the people will be deprived of the full and proper enforcement of laws enacted by the Michigan Legislature. Second, an injunction lowering the signature requirement would allegedly result in the disparate treatment of similarly situated candidates. ECF No. 6, PageID.118-19. On the first point, the State is correct that the Supreme Court has consistently recognized that states have a strong interest in seeing their laws effectuated. *See New Motor*

*Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). As to the second point regarding disparate treatment, it is the case that other candidates, including some running against Plaintiff for the Republican nomination in Michigan's Eleventh Congressional District, have already obtained enough signatures to appear on the August ballot. *See* Amicus Br. of Whittney Williams, ECF No. 21. If the Court were to grant Plaintiff's request to lower the minimum number of signatures required to appear on the August primary ballot, it would be permitting candidates to appear on the ballot who had gathered fewer signatures than those like Williams who have successfully met the threshold before April 21st. In considering the State's position, the Court agrees that the first point is well taken and that the State will likely suffer injury from not having its ballot access requirements enforced as written if an injunction issues. The question is balancing the significance of this harm against the deprivation of constitutional rights, as well as other public harms, that enforcement of those requirements would cause.

As to the second harm identified by the State, the alleged disparate treatment of candidates, this point is not well founded. Without any injunctive relief, the combination of the Stay-at-Home Order and the signature requirements operates to cause disparate treatment of those candidates who were fortunate enough to have met their signature requirement early as compared with those who were planning—and needing to use—the last twenty-nine days that they had assumed would be available to gather signatures.  One group benefits while the other loses.  Similarly, if injunctive relief were to lower the number of required signatures, one could argue that the early birds who might have gained an advantage from the Stay-at-Home Order's exclusion of their more procrastinating competitors would be "harmed" while the other candidates would be benefitted.  Both the status quo and the remedy sought by Plaintiff would arguably cause a form of disparate impact on candidates.  Consequently, the Court will not give weight to this second form of harm raised by the State.

The Court must weigh the State's proffered harm of not being able to enforce its ballot access requirements against the harm to the Plaintiff and the public harms that would result from the lack of any injunction.

29

The Court finds that the balance weighs in favor of an injunction. First, in the absence of an injunction, Plaintiff and other candidates in his position were left with no choice but to have violated the Stay-at-Home Order in order to collect the signatures they need. Indeed, some candidates have already admitted to having done so. *See* Bannister Decl. ¶ 36, ECF No. 15-2, PageID.278. The broader public interest is not served by preserving the current signature-gathering scheme at the cost of encouraging more candidates and their supporters to risk their health and criminal penalties to gather signatures.

Second, while Defendants accurately point out that voters do not have an "absolute right to vote for a candidate of [their] choice," it is also the case that a candidate's ability to appear on the ballot "affects the First Amendment rights of voters." *Blackwell*, 462 F.3d at 588; *see also Ill. State Bd. of Elections*, 440 U.S. at 184 ("By limiting the choices available to voters, the State impairs the voters' ability to express their political preferences."). Here, if a candidate should fail to obtain enough signatures because she had relied on the somewhat standard and eminently reasonable assumption that she would be able to ramp up signature collecting in the spring, Michigan voters may lose the ability to

vote for a candidate who, absent the pandemic, would have easily been included on the ballot. This would cause injury to the First Amendment rights of an innumerable number of Michigan voters.

Finally, were the Court to redress Plaintiff's injury by granting his request to lower the number of signatures required to qualify for the August primary ballot, the uniform nature of the relief would have some benefits both for candidates who had already met the current threshold as well as those who had collected a lesser number of signatures. For example, because Ms. Williams has already obtained one thousand signatures, any signatures she gathered in excess of a lower minimum would provide her, and any other candidates in her position, with a larger margin of signatures, should any of the gathered signatures later be deemed invalid.

### d. Remedy

Since the advent of the coronavirus, and the unfurling of its deadly pall across America, the governments of the several states have searched for solutions to protect their citizens' health, while at the same time

preserving fundamental democratic processes and liberties.[14]   In New York, Governor Andrew Cuomo, confronted with the same issue that is before this Court, reduced the number of petition signatures candidates would be required to obtain to thirty percent of the statutory requirement.  N.Y. Exec. Order No. 202.2 (Mar. 14, 2020).  Vermont suspended its signature requirement entirely.  H. 681, 2019-2020 Gen. Assemb., Adjourned Sess. (Vt. 2020).   At least three states have attempted to address the difficulty candidates face obtaining in-person signatures by allowing for electronically submitted signatures.   FL. Emergency R. 1SER20-2 (Apr. 2, 2020); N.J. Exec. Order No. 105 (Mar. 19, 2020); Utah Exec. Order No. 2020-8 (Mar. 26, 2020).

In responding to the public health risks that in-person voting presents, many states have taken actions designed to ensure adequate conditions for public participation.  At least sixteen states and one territory—Alaska, Connecticut, Delaware, Georgia, Hawaii, Indiana, Kentucky, Louisiana, Maryland, New Jersey, New York, Ohio,

---

[14] For an extensive review of the numerous examples of state initiatives aimed at protecting democratic processes in the wake of the COVID-19 pandemic, see *Changes to election dates, procedures, and administration in response to the coronavirus (COVID-19) pandemic, 2020*, Ballotpedia, https://ballotpedia.org/Changes_to_election_dates,_procedures,_and_administration_in_response_to_the_coronavirus_(COVID-19)_pandemic,_2020 (last accessed Apr. 19, 2020).

Pennsylvania, Rhode Island, West Virginia, Wyoming and Puerto Rico—
have either rescheduled their presidential primaries or adopted voting by
mail procedures with extended deadlines.[15]   In total, more than half of
the states have already postponed at least one election.[16]   It may be that
others will follow suit.

In Michigan, while extraordinary and well-coordinated efforts have
been adopted to protect the public health, fewer efforts have focused on
the challenges the virus has raised for the fair and effective functioning
of elections.[17]   Based on the record before the Court, for the reasons
explained above, Plaintiff has established that he is likely to succeed on
the merits of his claim and that he will suffer irreparable harm absent
an injunction.  The Court also finds that on balance, the public interest
would be served by the issuance of an injunction, and that the benefits to

---

[15] Nick Corasaniti & Stephanie Saul, *16 States Have Postponed Their Primaries Because of Coronavirus. Here's a List*, N.Y. Times (Apr. 17, 2020), https://www.nytimes.com/article/2020-campaign-primary-calendar-coronavirus.html.

[16] *See* footnote 14, *supra*.

[17] Some measures have been taken, for example, the Michigan Secretary of State announced that absentee ballots would be sent to all voters in preparation for the May 5, 2020 elections.  Mich. Sec'y of State, *Secretary of State to mail absent voter ballot applications to all May 5 voters* (Mar. 23, 2020) https://www.michigan.gov/sos/0,4670,7-127-93094-522761--,00.html?link_id=34&can_id=3ce03c3d77033bbeb4c4bf7ba04c984c&source=email-morning-digest-comeback-bid-by-former-attorney-general-highlights-utahs-quirky-ballot-access-rules&email_referrer=email_759189&email_subject=morning-digest-comeback-bid-by-former-attorney-general-highlights-utahs-quirky-ballot-access-rules.

the public and Plaintiff outweigh the injuries the State is likely to incur. Accordingly, Plaintiff is entitled to the extraordinary remedy of injunctive relief.

Plaintiff seeks relief from the application of the State's signature requirements—specifically Sections 168.133 and 168.544f—because of the severe burdens the State's Stay-at-Home Order has placed on his ability to gather signatures. *See* Mich. Comp. Laws §§ 168.133, 168.544f. Injunctive relief in the context of a forthcoming election is an equitable— and unusual—remedy, but it is not unprecedented.  In fact, at least one state court has already entered a preliminary injunction reducing a state statutory signature requirement because of the burdens put on candidates by the COVID-19 pandemic.  *Faulkner v. Va. Dep't. of Elections*, CL 20-1456 (Va. Cir. Ct. Mar. 25, 2020) (granting preliminary injunction and reducing candidate signature gathering requirements because of state's COVID-19 restrictions).  This Court agrees with the *Faulkner* court and finds that it is appropriate to enjoin Defendants from rigid application of those particular statutes, as well as any others that are substantively identical in causing the same kind of irreparable harm to similarly situated individuals.  At the same time, the Court also finds

that the State is legitimately concerned that a lowering of ballot access standards could result in "laundry list" ballots crowded with names that "discourage voter participation and confuse and frustrate those who do participate." *Lubin*, 415 U.S., at 715; *see also Briscoe*, 429 U.S. at 1322–23. Accordingly, the Court will balance the interests of both parties in fashioning a remedy.

The Court considers the proposed remedies suggested by the parties, together with the facts and applicable law, and finds that a three-pronged remedy is necessary to address the nature of the harm while simultaneously respecting the interest of the State. First, the signature requirements must be lowered to account for the fact that the State's action reduced the available time to gather signatures. Second, as the State has conceded that it could still meet its election planning obligations if the due date for signatures were extended until May 8, the Court will order that extension. Finally, to enhance the available means for gathering signatures, the State will be ordered to implement a method that would permit signatures to be gathered through the use of electronic mail. In doing so, the State is directed to design a system that is as "user-friendly" as possible to maximize its efficacy. For example, such

procedures should allow for the use of a digital copy of a real signature whether created by scanner or by a digital photograph, assuming that the signature is appropriately witnessed, such as through digital means as described in Executive Order 2020-41.

As stated, because the Court gives weight to the State's competing interests, the Court will not completely enjoin the enforcement of the signature requirements contained in Sections 168.133 and 168.544f. The Court will instead order the State to lower the minimum number of signatures required for candidates to be included on the August primary ballot and continue to accept signatures until May 8, 2020. This form of relief is also not without precedent. *See Faulkner v. Va. Dep't. of Elections*, CL 20-1456 (Va. Cir. Ct. Mar. 25, 2020) (reducing signature requirement sixty-five percent in light of COVID-19 restrictions); *see also Graveline*, 336 F. Supp. 3d at 817 (granting preliminary injunction and reducing signature requirement for attorney general candidate from 30,000 signatures to 5,000) *aff'd Graveline v. Johnson*, 747 F. App'x 408, 416 (6th Cir. 2018); *Jones v. McGuffage*, 921 F. Supp. 2d 888, 899 (N.D. Ill. 2013) (granting preliminary injunction and reducing candidate signature gathering requirements because upholding statutory signature

gathering requirements in context of truncated special election limited to Chicago winter would place unconstitutional burden on candidates).

The Court notes that a number of other candidates have sought to participate in this action because the outcome of this case will affect their access to the August primary ballot.[18]  In a separate order, the Court will permit some of the proposed plaintiffs to join this lawsuit, but because the State did not directly address the specifics of their factual claims, they are not thoroughly discussed here.  As to the question of how much the signature requirement should be reduced, Plaintiff, who has already obtained seventy percent of the signatures that he is required to obtain, is asking the Court to reduce the number of signatures required to sixty percent of the minimum number required pursuant to Section 168.544f. ECF No. 10, PageID.165.  Even such a reduction, however, would still present a significant hurdle for otherwise viable candidates, including those whose signature requirements are lower than Plaintiff's.  For example, candidates for certain city council positions subject to the April 21, 2020 deadline need only procure one hundred signatures.  *See* Bannister Decl. ¶ 5, ECF No. 15-2, PageID.273.  Such a candidate may

---

[18] *See* footnote seven, *supra*.

be able to easily collect one hundred signatures in as little as one week using traditional collection means like going door-to-door or canvassing at community centers. *Id.* ¶ 10. These candidates may have relied, reasonably and in good faith, on the ability to collect the vast majority of the signatures they needed in late March or early April, when rising temperatures would bring more people outside and facilitate signature gathering. *See, e.g.*, *Jones*, 921 F. Supp. 2d at 897. While any such line-drawing inevitably involves some degree of arbitrariness, common sense suggests that a reasonably diligent candidate should be expected to have reached the half-way point in gathering signatures when there is only one month to go. Consequently, a reduction in the requirement by fifty percent will be ordered. This reduction, combined with an extension of the signature-gathering deadline until May 8, 2020, and the adoption of an acceptable email-based method for collecting signatures, will be sufficient in these unusual circumstances to ensure both sufficient access to the ballot for those who seek it, and accommodation of the State's interest in ensuring candidates have a modicum of support before inclusion on the ballot.

## IV.   CONCLUSION

Accordingly, for all the reasons set out above, **IT IS HEREBY ORDERED**:

- That all candidates:

   - o (i) who filed a statement of organization under the Federal Election Campaign Act of 1971, 52 U.S.C. §§ 30101 *et seq.*, or established a candidate committee under the Michigan Campaign Finance Law, Mich. Comp. Laws, §§ 169.201 *et seq.*, before March 10, 2020; and

   - o (ii) who are required by a relevant section of the Michigan Election Law, Mich. Comp. Laws, §§ 168.1 *et seq.*, to file a nominating petition by April 21, 2020, for the purpose of appearing on the August 4, 2020, primary election ballot; and

   - o (iii) who do not have the option under Michigan Election Law to appear on the August 4, 2020, primary election ballot through the payment of a filing fee in lieu of filing a nominating petition;

- Shall be qualified for inclusion on the August 4, 2020 primary election ballot if the candidate submits fifty percent of the number

of valid signatures required by Mich. Comp. Laws § 168.544f with the appropriate filing official as provided by Michigan Election Law by 5:00 p.m. on May 8, 2020.  No other filing deadline is extended under this Order.

- Furthermore, the Director of Elections shall within 72 hours of the date of this Order adopt and promulgate, according to the specifications it determines to be appropriate and efficient, regulations providing for an additional optional procedure that allows the collection and submission of ballot petition signatures in digital form by electronic means such as email;

- Finally, the Director of Elections shall take all reasonable and necessary steps to communicate the terms of this injunction to county, township, and city clerks in this State who act as filing officials for offices for which nominating petitions are due as described in this Order.

**IT IS SO ORDERED.**

DATED this 20th day of April, 2020.

BY THE COURT:
/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge

40