UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

**ERIC ESSHAKI**, as candidate for United
States Congress and in his individual capacity;
**MATT SAVICH**, as candidate for the
Forty-Seventh District Court, Oakland County,
Michigan and in his individual capacity;
**DEANA BEARD**, as candidate for the Third
Circuit Court Judge, Regular Term,
Non-Incumbent Position in Wayne
County and in her individual capacity.

Plaintiffs,

vs.

**GRETCHEN WHITMER**, Governor of Michigan;
**JOCELYN BENSON**, Secretary of State of
Michigan; and **JONATHAN BRATER**,
Director of the Michigan Bureau of Elections,
in their official capacities,

Defendants.

Case No. 2:20-CV-10831-TGB

Hon. Terrence G. Berg

Mag. Elizabeth A. Stafford

---

### DECLARATION OF PLAINTIFF ERIC ESSHAKI

Pursuant to 28 U.S.C. 1746, I hereby declare as follows:

1. The signature data provided in this Declaration is not exact and is based on good faith estimates after consultation with my campaign staff.

1

2. On or around March 15, 2020, President Trump rolled out his "15 days to slow the spread" initiative (the "Initiative"). This Initiative, asked people to practice social distancing and take other measures to prevent the spread of the novel SARS-CoV-2 virus ("Covid-19").

3. On March 23, 2020, in response to the unprecedented Covid-19 pandemic, Governor Whitmer issued Executive Order 2020-21 (the "Stay-home Order" or the "Order").

4. As of March 31, 2020, my campaign staff assessed that we had approximately 700 petition signatures in our possession.[1]

5. On April 2, 2020, my campaign mailed an explanatory letter and blank petition forms to 1,000 homes within Michigan's 11th congressional district in an attempt to obtain petition signatures (the "First Mailing"). The cost of this mailing was approximately $2,400, including printing, postage, and labor. This included pre-stamping of return envelopes with a live first class stamp (55 cents each). I hoped

---

[1] Although Defendants Brief in Support of Emergency Motion asserts that 793 signatures were *collected* before March 23, around 93 of those signatures were not in my campaign's possession, nor did I have recollection or knowledge of their existence. However, when the media began to cover this case, volunteers who had collected signatures on my behalf before March 23 contacted my campaign in the days leading to the April 21 deadline and provided those previously collected signatures.

this would drive up response rates even though it increased the costs of the mailing.

6. On or around April 5, 2020, volunteers and campaign staff began making follow-up phone calls to the recipients of the First Mailing.

7. Those phone calls continued for the next several days, and it was discovered that many intended recipients of the First Mailing reported that they had not yet received the blank petition form in the mail.

8. On April 12, 2020, and in anticipation that the filing deadline might be extended, my campaign decided to conduct another round of mail (the "Second Mailing"). This Second Mailing was printed and stuffed, and was sent on April 15, 2020 to another 1,000 homes for an additional $2,400.

9. On April 14, 2020, I received and had in my possession approximately fifteen (15) properly signed petition forms that I received because of the mailing. At this point my confidence that a mail campaign was viable continued to be very low given the response rate to date and news reports of mail delivery issues.

10. On or around April 15, 2020 this case began to receive more heightened press coverage, which I believe had an impact on grass roots interest in filling out and delivering petitions to my campaign.

11. Over the next few days from April 16 through April 18 (Thursday, Friday, Saturday), I received approximately 150 signatures in the mail, with the bulk of these coming in on April 17, 2020.[2] Not all were properly executed, and some were invalid because they suffered from certain technical defects. I cannot attest to the precise specificity of the number of signatures I received on each of these days, but I visited the PO Box frequently, and these are my best recollections.

12. Midday on April 20, 2020, when I retrieved the mail from the PO Box and also from my home, I had received approximately 125 additional signatures. Again, many of these were not properly executed.

13. Dates on petitions do not indicate when those petitions were in my campaign's possession or when my campaign became aware of their existence.

14. Approximately 40% of the petition forms that I received in the mail had not been signed by the circulator or they suffered some other technical defect. My campaign staff and I worked hard prior to this Court's April 20, 2020 Order to contact several of these circulators

---

[2] On the evening of April 17, my campaign team and I had approximately 950 signatures in our possession, but approximately 50 of these were on petition sheets that had not been signed by the circulator.

and drive to their homes to obtain their signatures while maintaining the social distancing guidelines and taking other precautions.

15. In addition to receiving these signatures by mail, in the immediate days before April 21, some supporters contacted my campaign to let us know that they were leaving signed petition forms in their mailboxes for pick up, and additional signed petition forms were brought to my home by supporters.

16. M.C.L. 168.544f requires congressional candidates to submit at least 1,000 valid signatures. Candidates are permitted, however, to submit up to 2,000 signatures to provide a "cushion" because it is common to have several signatures "thrown out" for technical defects. The state has a normal procedure to inspect and disqualify signatures it believes are invalid.

17. On April 21, 2020, I submitted approximately 1,220 signatures to the Michigan Bureau of Elections.

18. Although on its face my submission meets the 1,000 signature threshold, because the signatures came from various sources during a flurry of activity and heightened media reporting in the final hours before the April 21, 2020 deadline, my campaign team and I have not

had an opportunity to properly vet all of the signatures for technical defects.[3]

19. After I filed on April 21, 2020, I received an additional 60 signatures through the mail or that were delivered to me on petition forms that had been signed by the circulator. I also received an additional 57, which had not been signed by the circulator.

20. According to these estimates, the response rate from my mail campaign appears to be around 20%, but approximately half of these contained technical defects and/or were incomplete because they did not contain the signature of the circulator when I first received them. This figure also includes signatures that arrived in the mail after I filed on April 21, 2020. These are my good faith estimates and should be taken as a plus or minus fair approximation because I do not have records that indicate the method that each signature was obtained.

21. I declare under penalty of perjury, that the foregoing is true and correct.

---

[3] Out of an abundance of caution and because I believed the possibility of appeal was likely, my campaign team and I decided to file on April 21, 2020 with the signatures we had and with the knowledge that we could continue to supplement the filing with additional signatures.

Executed on this 24th day of April 2020 by:

X  /s/ Eric Esshaki_____
    ERIC ESSHAKI

                      Respectfully submitted,

                      **LAW OFFICES OF GREGORY J. ROHL, P.C.**

By: /s/ Gregory J. Rohl (P39185)
       Gregory J. Rohl
       41850 W. Eleven Mile Road, Suite 110
       Novi, MI 48375
       (248) 380-9404
       gregoryrohl@yahool.com
       *Attorney for Plaintiff*

Dated: April 24, 2020

## **CERTIFICATE OF SERVICE**

**THE UNDERSIGNED** certifies that on the 24th day of April, 2020, the foregoing paper was electronically filed with the Clerk of the Court using the ECF system.

*/s/ Amanda Perkins*

Amanda Perkins

Legal Assistant